688 A.2d 16

**Deangelo Karlous JEFFRIES**

v.

**STATE of Maryland.**

**No. 1913, Sept. Term 1995.**

Court of Special Appeals of Maryland.

Jan. 29, 1997.

Kreg Paul Greer, Assigned Public Defender (Greer & Kennedy, L.L.C., on the brief), Towson, for Appellant.

Tarra DeShields–Minnis, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, Baltimore, and Andrew L. Sonner, former State's Attorney for Montgomery County, Rockville, on the brief), for Appellee.

Submitted before MOYLAN, CATHELL and HOLLANDER, JJ.

MOYLAN, Judge.

With respect to one of the convictions in this case, the appellant has a contention that, on its surface and in a purely technical sense, appears to have significant substance. As presented to us, however, it is a contention riddled with procedural flaws and inadequacies. The stakes on this issue are admittedly high. The conviction in question is for murder in the first degree. The sentence is one of life imprisonment. It must be remembered, however, that the stakes are correspondingly high for both sides of the trial table. In part because of the procedural inadequacies, the appellant will not be permitted to prevail on this issue. Although it is unlikely to soothe the appellant's sense of grievance, it nevertheless behooves a court occasionally to articulate the underlying philosophy that animates appellate review in situations such as this.

When due process demands, the law will reverse the conviction of an undisputed and cold-blooded killer even on a technicality *because it must.* A critical component of that principle,

however, is the qualifying clause "because it must." It is not with any sense of satisfaction that a court reverses on a technicality. When it does so, it does so reluctantly and with heavy heart, and only *because it must.* The philosophical converse is that when the procedural posture of an issue makes a reversal on a technicality a consequence that is not compelled but only gratuitously permitted, a court is frequently not motivated to be thus gratuitous.

There is a vast philosophical, as well as legal, distinction between due process and gratuitous process. There are procedural requirements that must be satisfied before *process* literally becomes *due.* For a reviewing court to overlook a precondition for review or to interpret loosely a procedural requirement, on the other hand, is an indulgence in favor of a defendant that is purely gratuitous. Even those who are indisputably factually guilty are entitled to due process. By contrast, only instances of truly outraged innocence call for the act of grace of extending gratuitous process. This appeal is not a case of outraged innocence qualifying for an act of grace.

The appellant, Deangelo Karlous Jeffries, was convicted by a jury in the Circuit Court for Montgomery County, Judge DeLawrence Beard presiding, of first-degree felony-murder, attempted first-degree murder, two counts of the use of a handgun in the commission of a felony, armed carjacking, and conspiracy to commit armed carjacking. He was sentenced to imprisonment for a total of two life terms plus one hundred years. On appeal, he raises the following issues:

1. Was the appellant improperly convicted of felony-murder when the underlying felony, armed carjacking, was not a specifically enumerated felony under section 410 of Article 27 at the time of the offense?

2. Did the trial court err in allowing the appellant's tee-shirt to be admitted into evidence?

3. Did the trial court err in permitting testimony about an unrelated gunshot wound of the appellant?

4.  Did the trial court err in allowing the admission of hearsay testimony?

5.  Did the trial court err in failing to suppress the appellant's statement as involuntary?

6.  Did the trial court err in rejecting the appellant's *Batson* challenge?

### *Factual Background*

The incident giving rise to this appeal was an unsuccessful carjacking that occurred in the early morning hours of September 9, 1994. At the time of the incident, Corporal Diane McCarthy of the Montgomery County Police Department was on break, having coffee with a friend on the third floor of the Wheaton Metro parking garage. At approximately 12:40 a.m., Corporal McCarthy noticed the appellant and another individual walking away from the Metro station. Although she briefly lost sight of them, minutes later she observed them on the parking lot walking over to a Ford Explorer. She observed that the individual with the appellant peered into one of the windows of the Explorer. Corporal McCarthy returned to her patrol vehicle in order to retrieve her binoculars. Based on further observations, she believed that the two were preparing to break into the vehicle.[1] She then radioed the police station to inquire as to whether any Special Assignment Team members were working. When she was informed they were not, she continued to observe the pair.

It was at this point that the two ultimate victims,[2] Heather McDonald and Daniel Huston, approached the Explorer.[3] Mr. Huston opened the passenger's side door of the Explorer[4] so

---

1.  Corporal McCarthy also observed the appellant's cohort duck down behind the vehicle and then walk around the vehicle.

2.  When appropriate, we shall refer to the two collectively as "the victims."

3.  Apparently the two victims had previously been at a nightclub in the area, where they had spent the evening with several friends.

4.  The Explorer belonged to Mr. Huston.

that Ms. McDonald could enter the vehicle, after which he proceeded to the driver's side. Just as he was about to enter the vehicle, the appellant and his cohort "stood up and rushed" Mr. Huston. Corporal McCarthy, still observing, radioed the police station that a carjacking was in progress. What transpired next was a series of events that ultimately led to the death of Mr. Huston [5] and to the serious injuries of Ms. McDonald.[6]

Immediately after Ms. McDonald entered the Explorer she heard loud voices. She heard one individual yell at Mr. Huston to get back into the vehicle. Mr. Huston obeyed and was then told to lie down in the back seat, which he did. Ms. McDonald was also ordered into the back seat of the Explorer. She complied. Mr. Huston apparently attempted to exit the vehicle, and it was at that point that gunfire erupted. Not knowing what had occurred, Ms. McDonald climbed out of the rear window of the Explorer,[7] dropped to the ground, and began to crawl away. After exiting the vehicle, she noticed that "something wasn't right," and she then realized that she had been wounded.[8]

Corporal McCarthy in her patrol car was heading toward the Explorer, when she noticed a police cruiser at the corner of a nearby street and she saw Mr. Huston lying face down in the parking lot. Shortly thereafter she saw Ms. McDonald, who was bleeding but alive. Another officer, Daryn Robinson of the District of Columbia Police Department, was patrolling nearby when he heard the gunshots. He approached the crime scene. About twenty minutes later, he observed a K–9

---

5. Daniel Huston was pronounced dead at the scene of the crime as a result of a gunshot wound to the back.

6. Heather McDonald suffered a total of eight gunshot wounds: two in the left side of her face, three in the side of her neck, one in her buttocks, and one in each hand.

7. The rear window had been blown out by gunfire.

8. Numerous other individuals who were near the scene of the crimes testified similarly regarding the events as well as provided descriptions of the assailants.

team retrieve three suspects from a nearby wooded area. After the suspects were removed from the scene, a 9 mm Glock pistol, a .38 caliber revolver, and ammunition were recovered from the woods.

Approximately one month later, an indictment was filed charging the appellant with murder, attempted murder, two counts of the use of a handgun in the commission of a crime of violence or felony, armed carjacking and conspiracy to commit armed carjacking. Also indicted were Allen Emmanuel Swanson and Ruben Carl Carson. The cases were consolidated for trial. The trial, which commenced on March 9, 1995 and ended on March 24, resulted in a verdict of guilty on all counts against the appellant.[9] The jury based its murder conviction on the theory of statutory felony-murder. The appellant was specifically found not guilty of first-degree premeditated murder, of second-degree murder, and of attempted second-degree murder. The appellant received two life sentences plus one hundred years for the offenses. After the Motion to Dismiss made by the appellant was denied, the appellant noted this appeal.

### The Felony–Murder Conviction

The appellant's first contention stems from his conviction of statutory felony-murder, presumably based on the predicate felony of armed carjacking. The appellant maintains that he was improperly convicted of felony-murder because, at the time of the commission of the offense, carjacking was not one of the specifically enumerated felonies listed in Md. Ann.Code, art. 27 § 410 (1996), which could give rise to a conviction of first-degree felony-murder. In support of his argument, the appellant points out that the offense was committed on September 9, 1994, and that carjacking did not become one of the offenses listed in section 410 until October 1, 1994, approxi-

---

9. Codefendants Swanson and Carson were found not guilty of all charges.

mately one month after the crime.[10] Thus, the appellant asserts, he was "convicted of a crime that did not exist at the time of the incident[.]"

We fully agree with the appellant's recitation of the legislative history of carjacking as one of the felonies spelled out in § 410 which will raise a murder committed in its perpetration or attempted perpetration to the level of murder in the first degree. The appellant fails to persuade us, however, as to what significance that legislative history has on his post-verdict Motion to Dismiss. Indeed, before we can even look at the content of the appellant's motion, we must try to determine what kind of a motion it is. Frankly, we are at a loss.

It is important to keep in clear focus what precise action of Judge Beard, either of commission or of omission, it was that the appellant now claims was reversible error. Significantly, it is Judge Beard's denial of the appellant's post-verdict Motion to Dismiss—and nothing else. On this issue, the appellant does not directly attack any judicial action taken or omitted in the course of the trial itself. To the extent that anything—such as the jury instruction on felony-murder—is mentioned, it is only by way of providing context for Judge Beard's ruling on the post-verdict Motion to Dismiss. No alleged trial error is even raised as the direct subject of this appeal. To the extent to which any trial action is even alluded to, it is only as a factor arguably bearing on Judge Beard's denial of the appellant's post-verdict Motion to Dismiss.

In examining the propriety of the appellant's motion (whatever kind of a motion it turns out to be), the time frame assumes critical importance. The trial proper was concluded and the jury verdicts were rendered on March 24, 1995. The post-verdict Motion to Dismiss was filed on October 23, seven months after the verdicts were announced. A hearing on the Motion was held and it was denied on November 28, eight

---

**10.** The appellant correctly points out that when adding carjacking to the list of enumerated felonies in section 410, the General Assembly did not intend for the addition of the crime to apply retroactively.

months after the adjudicative phase of the trial had been completed.

Our first question is, "Why did the appellant file something that he chose to title a Motion to Dismiss?" The redress that he sought by way of this Motion—filed on October 23 and resolved on November 28—was a form of post-verdict remedy. A Motion to Dismiss is not inherently, if at all, a post-verdict or post-trial remedy. An appeal, on the other hand, is a post-trial remedy. A request to a circuit court for *en banc* reconsideration is a posttrial remedy. A post-conviction petition is a post-trial remedy. A motion to a trial judge to reconsider a sentence is a post-trial remedy. A request to a circuit court for a sentence review panel is a post-trial remedy.

A quintessential post-verdict remedy, addressed to the judge who presided at the trial, is a Motion for New Trial as provided by Md. Ann.Code, art. 27 § 594 (1996) and Maryland Rule 4–331. To the natural question of why the appellant did not entitle his request for post-verdict relief in this case a Motion for New Trial, the answer is almost certainly that provided by *Love v. State,* 95 Md.App. 420, 423, 621 A.2d 910 (1993):

> The Motion for New Trial is one of the posttrial remedies. *It is by no means,* however, *a never-failing panacea,* available whenever and however outraged justice may beckon. It is designed to correct some, but not all, flaws that may have marred a trial. *It is limited,* moreover, *by rigid filing deadlines* and other formal constraints. (Emphasis supplied).

If framed as a Motion for a New Trial, apparently based on non-preserved chagrin at a jury instruction and even that only by way of long-delayed afterthought, the appellant's complaint would have failed to meet the ten-day filing deadline of Rule 4–331(a) by over six-and-a-half months. What the appellant seeks to do, therefore, is to conceal the functional equivalent of a Motion for a New Trial inside the Trojan Horse of a Motion to Dismiss and thereby to insinuate into the citadel of post-verdict review an argument that, undisguised and on its own,

could never have made it past the first sentry post of the filing deadline. We must look to the propriety of such a stratagem.

### 1. *Was This Really A Motion to Dismiss Under Rule 4–252(d)?*

A Motion to Dismiss (or to do anything else to) *a conviction* for a non-existent crime is, by definition, a post-verdict motion. Until there is first a verdict, there self-evidently can be no conviction to dismiss. The post-verdict relief provided by Maryland law, for the legal insufficiency of the evidence produced at trial or for some other trial error (such as an erroneous jury instruction, perhaps), is a Motion for New Trial. Its contours are spelled out by Rule 4–331. The appellant, however, openly pursuing that proper form of relief, would have had no way around the foreclosing effect of Rule 4–331(a):

> On motion of the defendant *filed within ten days after a verdict,* the court, in the interest of justice, may order a new trial. (Emphasis supplied).

Except for the special case of newly discovered evidence, the ten-day filing deadline is an absolute. As *Love v. State,* 95 Md.App. 420, 427–28, 621 A.2d 910 (1993) pointed out:

> [A]warding a new trial is tightly circumscribed by the timeliness requirement that the Motion be filed "within ten days after a verdict." ... Trial judges, moreover, are not empowered to overlook the filing deadline. *State v. Tull,* 240 Md. 49, 52, 212 A.2d 729 (1965); *Giles v. State,* 231 Md. 387, 388, 190 A.2d 627 (1963); *Ware v. State,* 3 Md.App. 62, 65–66, 237 A.2d 526 (1968).

The appellant's attempted solution was to transmute his request for post-verdict relief, essentially based on an allegedly erroneous jury instruction to which he had not objected, into some other procedural entity that would not be time-barred. Could he turn a Motion for New Trial into something else by calling it something else? He came tantalizingly close to doing so. He got the trial judge, for instance, to consider the

merits of a question that should not even have been entertained.

By emphasizing the words "Motion to Dismiss" and whispering, *sotto voce*, their predicate, "a conviction," the appellant almost succeeded in concocting not a post-verdict motion at all, governed by Rule 4–331, but a very different kind of motion, governed by Rule 4–252 and immune to filing deadlines. Almost all motions, other than post-verdict and post-trial motions, must be filed well before the commencement of a trial. Rule 4–252(b). An exemption from that mandatory filing deadline is provided by subsection (d), which provides, in pertinent part:

> A motion asserting failure of the charging document ... to charge an offense may be raised and determined at any time.

In his memorandum in support of his ostensible "Motion to Dismiss," it is Rule 4–252(d) that the appellant invokes as his exemption from a filing deadline. Can, however, the appellant's motion qualify under Rule 4–252(d)? No, but he gets an "A" for effort. The appellant's language in arguing this contention resonates, albeit distantly and unclearly, with echoes that sound beguilingly like an attack on the adequacy of the charge. As the appellant puts it in his brief, he was "convicted of a crime that did not exist." At another point in his brief, the appellant asserts that he "was convicted of a crime that did not exist at the time of the incident in the present case." That sounds deceptively like an attack on a charge. It is not, however.

■ Even if what the appellant alleges were true (it is not, as we shall explain *infra*), it would not be a case of the "failure of the charging document ... to charge an offense." To be *convicted* of a non-existent offense, grievous though such a fate might be, is not the same thing as to be *charged* with a non-existent offense. A Motion to Dismiss an indictment or a particular count of an indictment for the failure to charge an offense is an attack on the adequacy of the prosecution's pleading. The merits of such a Motion, moreover, may

be determined by examining the four corners of the charging document and require no reference to the trial. The issue concerns only the adequacy of the pleading and not the sufficiency of the evidence or the propriety of the trial.

The appellant, however, was not convicted of, let alone charged with, a non-existent crime. He has badly misidentified the crime in issue. He was neither charged with nor convicted of some crime known as carjacking-murder. There is no such crime. The appellant was charged with and convicted of the crime of murder. Murder, of course, was not only in existence as a crime on September 9, 1994, the day on which the appellant murdered Daniel Huston; it has been in existence as long as the Anglo–American common law itself. The charging document, Count One of the indictment, adequately charged the appellant with murder:

The Grand Jurors of the State of Maryland, for the body of Montgomery County, upon their oaths and affirmations, present that DEANGELO KARLOUS JEFFRIES, on or about September 9, 1994, in Montgomery County, Maryland, unlawfully, willfully and of deliberately premeditated malice aforethought, did kill and murder Daniel Huston, in violation of the Common Law and against the peace, government and dignity of the State.

That is the charging document in question and there is no mention of "carjacking" therein. Murder was "the crime" with which the appellant was charged and of which he was convicted. The very wording of the indictment used in this case has received the blessing of the Maryland Legislature. Art. 27 § 616. It has, moreover, received the *imprimatur* of the Court of Appeals. *Neusbaum v. State,* 156 Md. 149, 143 A. 872 (1928); *Kelley v. State,* 181 Md. 642, 31 A.2d 614 (1943). There is no way that the appellant can maintain that the wording of a murder indictment that has received the continuing approval of both the General Assembly and the Court of Appeals fails to charge the offense of murder.

Even so basic a division of murder as that which split it into two degrees for punishment purposes, ch. 138 of the Acts of

1809, did not turn murder into two separate crimes. The crime, regardless of degree, remained simply murder. *Weighorst v. State*, 7 Md. 442, 451 (1855); *Hanon v. State*, 63 Md. 123, 126 (1885); *Abbott v. State*, 188 Md. 310, 312, 52 A.2d 489 (1947); *Chisley v. State*, 202 Md. 87, 96, 95 A.2d 577 (1953); *Stansbury v. State*, 218 Md. 255, 146 A.2d 17 (1958); *Gladden v. State*, 273 Md. 383, 330 A.2d 176 (1974).

█ *A fortiori*, even lesser distinctions among the various theories, rationales, or *mentes reae* that may support a conviction for either second-degree or first-degree murder do not create separate crimes. The crime is still murder whether based, for instance, on a finding of an intent to commit grievous bodily harm or on a finding of a depraved heart. Sections 407, 408, 409, and 410, setting out various *mentes reae* and circumstantial modalities that will qualify murder as murder in the first degree, do not represent separate crimes but only establish alternative ways of finding the requisite aggravation. *Wood v. State*, 191 Md. 658, 666–67, 62 A.2d 576 (1948).

Within the more particularized realm of statutory felony-murder, the even more parochial distinctions among fifteen separate felonies and fifteen respective attempts (Art. 27, §§ 408, 409, 410) do not create thirty separate crimes. They represent nothing more than thirty different factual possibilities or modalities for committing felony-murder in the first degree. A unanimous verdict of guilty of first-degree felony-murder would not be overturned even if it could be conclusively determined that six of the jurors stopped their analysis after concluding that the murder in question occurred in the course of an in-house robbery, five others analyzed it only in terms of a murder in the course of a burglary, and one lone juror (not sure that the victim had any money) reached the conclusion that the murder occurred in the course of an attempted robbery. The unanimous verdict would have been guilty of the single crime of felony-murder, and not three fragmented decisions with respect to three separate crimes of

robbery-murder, burglary-murder, and attempted-robbery-murder.

Even allowing for the fine tuning as to 1) degree and 2) murderous *mens rea*, the appellant here was charged with and convicted of generic first-degree felony-murder, not carjacking murder. First-degree felony-murder existed as a crime on September 9, 1994. There was no basis to dismiss the charging document. If, on the other hand, the motion was something other than a Motion to Dismiss on the ground that the charging document failed to charge an offense, it was not timely filed.

Had the appellant succeeded with his subtle procedural alchemy, it must be pointed out, he might well have reaped a reward grossly inordinate to anything he could have hoped for under a timely filed and meritorious Motion for New Trial. On a Motion for New Trial, the most a defendant can achieve is a new trial. In the appellant's "Motion to Dismiss," by contrast, he began modestly enough by requesting that the trial judge "dismiss *the verdict of guilty* to Count One, Murder," (emphasis supplied) but he arguably raised the stakes with his final prayer for relief:

> WHEREFORE, the Defendant requests that this Honorable Court dismiss Count One of the indictment.

Such a dismissal, if granted, might well have entitled the appellant to go "scot-free" for the murder of Daniel Huston. It is not unlikely that the appellant would have argued for just such a result if his Motion had been granted and had the State then sought to retry him. He would then have argued that the "dismissed" count embraced far more than carjacking-murder. In any event, the appellant's Motion (whatever it was) was denied, and we affirm that denial.

### 2. *Was the Motion, in Effect, a Motion for New Trial?*

As a motion that, in its exclusive thrust, challenged a trial verdict as being the allegedly flawed result of an alleged trial error, it was, in full effect and notwithstanding its deceptive label, a Motion for New Trial. The absolutely dispositive

fact is that, as such, it was filed 203 days late. Neither Judge Beard nor we are authorized to overlook the ten-day filing deadline and to consider the motion's merits, even were we disposed to do so. (We are not.) For that reason alone, the appellant's first contention must fail.

The rest is *dicta.* We add these further and gratuitous observations in order to stress the point that the procedural flaw in the appellant's first contention that forecloses any consideration of its merits has not produced a hard case of outraged innocence. The appellant was convicted of first-degree felony-murder and he was guilty of first-degree felony-murder. The trial evidence abundantly supported that verdict in a variety of ways. The evidence was legally sufficient to have permitted a juror reasonably to have found that the murder of Daniel Huston occurred as the result of the appellant's perpetration of 1) the robbery of Daniel Huston's automobile, 2) the attempted robbery of that automobile, 3) the kidnapping of Daniel Huston (he was forced at gunpoint to lie down in the back of the automobile, presumably in preparation for its being driven away), 4) the attempted kidnapping of Daniel Huston, 5) the kidnapping of Heather McDonald, or 6) the attempted kidnapping of Heather McDonald. It would, moreover, be hard to overturn, on legal insufficiency grounds, a finding that the bullet that killed Daniel Huston was part of a fusillade of bullets fired in the course of 7) the maiming or 8) the attempted maiming of Heather McDonald (eight gunshot wounds, including two in the left side of her face and three in the side of her neck). In actual fact and quite aside from carjacking, the appellant was guilty of first-degree felony-murder—squared and cubed. Other than to make a distinction between premeditated murder and felony-murder, a practice which is encouraged but not required, no more particularized parsing of the jury's decisional process has ever even been suggested. *State v. Frye,* 283 Md. 709, 721-25, 393 A.2d 1372 (1978). *See also Oken v. State,* 327 Md. 628, 665-67, 612 A.2d 258 (1992). The fact that the jury may have been invited to consider one rationale rather than six or eight other readily available rationales hardly produced a case of outraged inno-

cence. In the jury's verdict of felony-murder, justice was done.

Under the circumstances of this case, moreover, the premature inclusion of carjacking in the felony-murder catalogue actually added nothing to the list of first-degree rationales. But for a slight and arcane difference in their respective *animi furandi*,[11] an esoteric nuance not remotely involved in the circumstances of this case, carjacking is but a particularized instance of the broader crime of robbery. As a practical matter and as far as the circumstances of this case were concerned, the carjacking was simply the robbery of Daniel Huston's automobile, as opposed to a more generic robbery of his wallet or of his watch. "A rose by any other name...." As a purely abstract matter, the instruction may have been academically flawed. That issue, however, has been neither preserved nor presented. Nor has justice in its larger sense been damaged or offended, let alone outraged.

### 3. The Denial of the Motion: Conclusion

Affirming the denial of the appellant's "Motion" was easy. The difficulty was in identifying precisely what it was that was properly denied. In the last analysis, the appellant had no complaint with the charging document. In the last analysis, the appellant had no complaint with the evidence against him on the charge of murder. The appellant's real objection, though he never clearly stated it as such, was to an erroneous instruction, to which he never objected at trial and which in the circumstances of this case did not make any difference.

---

11. The common law felony of robbery was not affected by the transformation of most of Maryland's forms of larceny and larceny-related offenses into a Consolidated Theft Statute. Robbery retains its common law character of a larceny from the person by force or threat of force. As a result, one of its elements is the *animus furandi* of larceny, which is the intent to deprive the owner permanently of the property taken. Carjacking, by contrast, does not require the intent permanently to deprive the owner of possession. It could include the unauthorized use of an automobile if taken from the person by force or threat of force. That subtle distinction, however, was not in any way implicated in the circumstances of the present case.

The medium through which the appellant expressed that indirect and after-the-fact objection was, though not labelled as such, a Motion for New Trial. It was, however, a Motion for New Trial that was not timely filed.

## *Admission of the Appellant's Tee-shirt*

The appellant next argues that the trial court erred when it admitted into evidence the tee-shirt that the appellant was wearing on the night of the incident. The tee-shirt was black with white lettering on the front, which stated: "Only real niggaz live by the trigger!" The shirt also depicted hands holding a submachine gun. The appellant contends that the shirt was improperly admitted because it "was clearly inflammatory and prejudicial, for self-evident reasons," and the writing on the shirt was "unquestionably irrelevant." Furthermore, he argues that admission of the shirt into evidence was not necessary to prove identity, because the appellant had admitted being at the scene of the crime.

Evidentiary rulings, particularly those hinging on relevance, are entrusted to the wide discretion of the trial judge. An appellate court will not second-guess such a decision absent a clear abuse of the trial judge's discretion. *Ebb v. State,* 341 Md. 578, 587, 671 A.2d 974 (1996); *Hunt v. State,* 321 Md. 387, 425, 583 A.2d 218 (1990). We see no such clear abuse in this case. The tee-shirt worn by the appellant at the time of his arrest was relevant to prove both his presence at the crime scene and the degree and nature of his participation. Although the appellant admitted in a statement to the police that he was at the crime scene generally, he also stated that he left that scene when he heard "two shots" and experienced "bullets pinging off of the wall beside him." Implicitly, he disclaimed being one of the shooters; expressly, he pinned all of the blame on his codefendant whom he identified as "James." Because the other participant in the holdup was described by various witnesses as wearing a black tee-shirt on which was emblazoned a white skull, it became important to pinpoint the appellant as the participant who was wearing the black tee-shirt with something other than a white skull.

A witness, Dan Fribush, described the person who stood over and shot Heather McDonald as one whose clothing resembled the appellant's and not as the fatter individual whose tee-shirt depicted the white skull. Corporal Diane McCarthy, who observed the total incident unfold from before the time the two victims even came on the scene until well after the shooting, made an in-court identification of the appellant as the smaller of the two participants and explicitly as the one who was not wearing the black tee-shirt with the white skull.

Aside from the visual observations that involved it, the tee-shirt worn by the appellant had additional probative force. Heather McDonald identified the appellant as the only one of the two assailants who, immediately after ordering both Ms. McDonald and Daniel Huston into the back of the car, entered the car and sat down in the driver's seat. She testified that that individual had a gun. Corroborating her identification of the appellant as that particular participant was the fact that multi-colored threads were found in the interior of the Ford Explorer that were consistent with those in the tee-shirt worn by the appellant.

Although the appellant now adamantly asserts that the words on his tee-shirt were not in themselves relevant, he mistakes the nature of their relevance. The particular black tee-shirt worn by the appellant was relevant not so much for what it said or depicted as for what it did not depict. It was relevant to show that the appellant was wearing a tee-shirt that did not depict a white skull. The words of which the appellant now complains were something other than a white skull and were, for that reason, relevant. In any event, Judge Beard was not guilty of any clear abuse of discretion in making the evidentiary judgment call that the tee-shirt was relevant.

### Admission of the Appellant's Previous Gunshot Wound

The appellant's third contention is that the trial court improperly admitted testimony of a previous gunshot wound

the appellant had suffered, which was completely unrelated to the current incident. The evidence of the wound came to the attention of the jury because on the night of the incident while the appellant was being apprehended, he was bitten on the arm by one of the K–9 dogs. One of the officers on the scene realized that the injury needed medical attention, and the appellant was transported to Holy Cross Hospital where he received the appropriate care. Dr. Raymond White, the emergency room physician who treated the appellant, testified at trial that he noticed a previous gunshot wound that the appellant had suffered on the same arm as the dog bite. Dr. White further testified, over objection of defense counsel, that he was concerned that the gunshot wound may have been reinjured by the dog bite.

The appellant now contends that evidence of the prior gunshot wound should not have been brought to the jury's attention because "[i]t had absolutely no relevance in the State's case and did nothing but prejudice [the appellant's] defense," and it further portrayed the appellant "as a violent person who came from a violent environment." Thus, the appellant would have us find reversible error on the ground that the previous gunshot wound was improperly admitted as other crimes or other bad acts evidence.

We need not, however, consider the merits of the appellant's argument because he has not preserved the issue for our review. Although defense counsel objected to the evidence at trial, he did so only on the ground of relevancy. He raises for the first time on appeal the argument that the evidence should have been excluded on the grounds of other crimes or other bad acts evidence. As this Court has previously held, "when the grounds for an objection are stated by the objecting party, either on a volunteered basis or at the request of the court, only those specifically stated are preserved for appellate review; those not stated are deemed waived." *Banks v. State,* 84 Md.App. 582, 588, 581 A.2d 439 (1990); *see also Brecker v. State,* 304 Md. 36, 39–40, 497 A.2d 479 (1985). Therefore, we need not explore the merits of the appellant's contention.

An objection to the admission of evidence on the ground of irrelevance is by no means the same thing as an objection to evidence on the ground of unfair prejudice. Indeed, the thrust of an unfair prejudice argument is that the prejudicial effect outweighs the acknowledged relevance. If the evidence were truly totally irrelevant, it would have little, if any, capacity to prejudice. At trial, the appellant objected on the ground of irrelevance but that objection has not been pursued on appeal. On appeal, by contrast, the appellant's argument is exclusively one of prejudice of the "other crimes" evidence variety, but that objection was not preserved for appellate review. The argument that was preserved is not being pursued; the argument that is being pursued was not preserved.

Even if the merits of the prejudice claim were before us, however, we fail to follow the appellant's argument either as a matter of law or as a matter of logic. He cites us no case, and we are aware of none, that holds that a gunshot wound or other scar is evidence of "other crimes." See, moreover, *Oken v. State,* 327 Md. 628, 665–70, 612 A.2d 258 (1992). The gunshot wound in the appellant's arm, *per se,* no more implies that he was previously involved in crime than it implies that he is a decorated and valorous hero of the Persian Gulf. Indeed, were Heather McDonald to be called as a witness in some future case, the eight gunshot scars she would then be carrying would by no means imply that she had a criminal record.

### Admission of Hearsay Evidence

The fourth argument which the appellant raises on appeal is that hearsay evidence was improperly admitted at trial. Specifically, the appellant complains of the testimony of Dr. Daniel Powers, the surgeon who treated Ms. McDonald immediately after the incident. At trial, Dr. Powers identified notes of one of the nurses on duty in a toxicology report which said that Ms. McDonald recalled the incident vividly. Subsequent to Dr. Powers's testimony, the lab report containing the controversial remark was admitted into evidence as a medical record of Ms. McDonald. On appeal, the appellant maintains that the evidence was hearsay improperly admitted at trial.

Again, we need not address the merits of the appellant's contention due to a lack of preservation. Although defense counsel objected to the report during the State's redirect examination of Dr. Powers, the appellant failed to object when the report was admitted into evidence. Hence, where testimony that comprises the basis of an earlier objection comes in later without objection, the earlier objection is waived for the purpose of appellate review. *Peisner v. State*, 236 Md. 137, 144, 202 A.2d 585 (1964). Because the appellant failed to object to the admission of the report, he has waived any complaint he may have had.

If the merits of the contention were properly before us, the result would not be different. The evidence of Ms. McDonald's vivid recall was offered after defense counsel had elicited testimony regarding her blood alcohol level. The clear effect of that was to impeach her ability accurately to perceive, to remember, and to narrate the critical events. The observations in question of the duty nurse served to rehabilitate that questioned capacity to observe, to remember, and to narrate. The nurse's observations of Ms. McDonald's conversation were offered not for the substance of what Ms. McDonald said (that would be hearsay) but for the way in which she said them (that is classic non-hearsay).

### Voluntariness of the Appellant's Statement

The appellant also claims that a statement that he made at the police station at approximately 9:15 on the morning of the incident was involuntary and should have been suppressed at trial. The appellant sets forth several circumstances [12] that he believes warrant a finding of involuntariness and, therefore, necessitate reversal.

---

12. The appellant claims that the following, when examined in their totality, warrant our finding that the statements of the appellant were involuntary: the appellant had been at the hospital for eight hours without any sleep, food, or water; he was in a great deal of pain from the recent dog bite; prior to the questioning the appellant had not slept for approximately twenty-four hours; he had no recollection of being told that he had a right to counsel or that he could have an attorney

We disagree. Making our own independent determination of the voluntariness of the appellant's statement based on the record of the suppression hearing, *see Riddick v. State*, 319 Md. 180, 183, 571 A.2d 1239 (1990), we find ample evidence to support the admission of the statement at trial. For example, Detective Fallon, the officer who accompanied the appellant to the hospital, testified at trial that the appellant was given his *Miranda*[13] warnings and was not on any medication. The detective further observed that the appellant appeared sober, seemed to understand the questions being asked, and, while at the police station, was "very congenial, very cooperative." The questioning of the appellant was approximately fifteen minutes in duration, and the appellant signed his statement after he had "looked it over." Furthermore, there was no evidence of promises or threats made during the course of the interrogation. Dr. White also testified that while the appellant was at the hospital he appeared to be lucid and understood instructions.

It is undisputed that on appellate review, "[w]e extend great deference to the fact finding of the suppression hearing with respect to determining the credibilities of contradicting witnesses and to weighing and determining first-level facts." *Perkins v. State*, 83 Md.App. 341, 346, 574 A.2d 356 (1990). Accordingly, when considering all evidence based on a totality of the circumstances, we find that the appellant's statement was properly admitted as voluntary. *See Hof v. State*, 337 Md. 581, 595, 655 A.2d 370 (1995).

### *Batson Challenges*

The appellant finally contends that the trial court

present during questioning; and he had consumed alcohol and narcotics during the evening prior to the incident.

13. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

improperly denied his *Batson*[14] challenges to the State's exercise of its peremptory strikes. During jury selection, the State informed the court, once twelve individuals had been selected to serve as jurors, that it wished to use twelve of its peremptory challenges to exclude the entire panel. Three of those twelve jurors were African–Americans.[15] Defense counsel observed that only approximately twelve African–Americans were on the entire panel, and by the State exercising its peremptory challenges in the way that it did, the State successfully excluded one-fourth of the African–American panel. Interestingly, the appellant does not tell us what fraction of the non-African-American panel was excluded by the exercise of the other nine peremptory challenges against non-African-Americans. The strikes may have been, with respect to all groups, so randomly proportional that no pattern at all was established so as even to call for the prosecution's explanation of its peremptories.

The trial court, however, implicitly found a pattern of *prima facie* discrimination and inquired, therefore, into the State's reasons for excluding the three African–American jurors. As to the first juror, the State contended that the juror failed to respond to the court's question about knowledge of the crime; as to the second, the juror apparently had a nephew who felt that he had been falsely accused of a crime, and the State, therefore, felt the juror would be risky; as to the third, the State maintained that the juror did not respond in the affirmative to any question posed by the court during the *voir dire* process. The appellant contends that the reasons for excluding the three jurors were not race-neutral and that the trial court in fact had difficulty with the reasons espoused by the State.

What matters, however, is Judge Beard's ultimate ruling. He found the prosecutor to be fully creditable in explaining his

---

**14.** *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

**15.** The appellant is also an African–American.

actual reasons for the three peremptories. The three reasons, accepted at face value, are self-evidently race-neutral. The failure to respond to the court's question about knowledge of the crime is race-neutral. To have a nephew whom one believes was falsely accused of crime is race-neutral. To be non-responsive during the *voir dire* process is race-neutral. Judge Beard found that the reasons proffered by the State, therefore, were race-neutral.

In reviewing a trial judge's decision of this nature, the Supreme Court has told us that appellate courts must be highly deferential and will not presume to overturn a trial judge's findings on this issue unless they are clearly erroneous. *Purkett v. Elem,* 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (per curiam); *Hernandez v. New York,* 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991).

As this Court has previously observed,

[i]n a practical sense, if, after the party opposing the strike has presented a *prima facie* showing, the proponent thereof proffers a facially neutral reason *that is accepted by the trial court,* then an appeal on *Batson* principles has little, if any, chance of success, given that the credibility of the proponent offering the reason is, as it is generally, for the trial court—not an appellate court—to determine.

*Ball v. Martin,* 108 Md.App. 435, 456, 672 A.2d 143, *cert. denied,* 342 Md. 472, 677 A.2d 565 (1996) (Emphasis in original); *see also Booze v. State,* 111 Md.App. 208, 681 A.2d 534 (1996). We hold that the findings of the trial court were not clearly erroneous and will, therefore, be affirmed. *See Gilchrist v. State,* 340 Md. 606, 627, 667 A.2d 876 (1995).

*JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.*