822 A.2d 434

**James Edward PERRY,**

v.

**STATE of Maryland.**

**No. 0667, Sept. Term, 2001.**

Court of Special Appeals of Maryland.

Nov. 7, 2002.

Reconsideration Denied April 22, 2003.

406

Claudia A. Cortese, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Ann N. Bosse, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore and Douglas Gansler, State's Atty. for Montgomery County, Rockville, on the brief), for appellee.

Argued before MURPHY, C.J., CHARLES E. MOYLAN, JR. (retired, specially assigned) RAYMOND G. THIEME, JR. (retired, specially assigned), JJ.

CHARLES E. MOYLAN, JR., Judge, Retired, Specially Assigned.

The appellant, James Perry, stands convicted, on four separate charges, of as sordid a series of cold-blooded executions as is to be found in the annals of Maryland crime. He was a "hit man" out of Detroit, Michigan, with no prior involvement with either the State of Maryland or with the persons he was hired to come into Maryland to murder. He killed, as he had been hired to do, a severely handicapped, quadriplegic eight-year-old boy along with the boy's mother for a combined price of $6,000. The third murder was randomly gratuitous. An unanticipated witness to the planned murders was in the wrong place at the wrong time and had to be eliminated as an inconvenient nuisance.

For his initial convictions in the Circuit Court for Montgomery County on October 12, 1995, for three counts of murder in the first degree and one count of conspiracy to commit murder, the appellant received three sentences of death for the murders and a sentence of life imprisonment for the conspiracy. On the initial appeal, the Court of Appeals in *Perry v. State*, 344 Md. 204, 686 A.2d 274 (1996), affirmed both the convictions and the sentences, without prejudice, however, to the appellant's right to raise on post conviction petition his claim that he had been denied the effective assistance of counsel.

Following a three-day hearing before Judge S. Michael Pincus in January, 1999, the appellant's petition for post conviction relief was denied. On December 10, 1999, however, a 4–3 majority of the Court of Appeals reversed the denial of post conviction relief and granted the appellant a new trial. *Perry v. State*, 357 Md. 37, 741 A.2d 1162 (1999).

Following eight separate days of motions hearings between September, 2000, and March, 2001, a 27-day trial began on March 4, 2001, before a Montgomery County jury, meticulously presided over by Judge Martha G. Kavanaugh. Both the investigative effort and the prosecutorial effort in this case were masterful. On April 19, the jury convicted the appellant of three counts of murder in the first degree and one count of conspiracy to commit murder.

Following a three-day sentencing hearing before the same jury, the jury declined to impose the death sentence because it was not persuaded beyond a reasonable doubt that the appellant had been the principal in the first degree. The jury sentenced the appellant to three sentences of life imprisonment without the possibility of parole for the murders and a sentence of imprisonment for life for the conspiracy.

On this appeal, the appellant raises four questions:

1. Did Judge Kavanaugh err in giving a supplemental instruction to the jury on aiding and abetting in response to a jury request after earlier having ruled that the facts did not support such an instruction?

2. Did Judge Kavanaugh err in admitting into evidence the fact that the appellant refused to sign the fingerprint card made on August 22, 1994?

3. Did Judge Kavanaugh commit plain error when she permitted the prosecution in closing argument to comment impermissibly on the appellant's failure to testify?

4. Was the appellant denied his right to allocution?

A reasonably full recital of the factual background is appropriate because it will have a bearing on the appellant's first and third contentions.

## The Crime Scene of March 3, 1993

On March 3, 1993, at approximately 7:15 a.m., Vivian Rice drove from her home at 13616 North Gate Drive in Silver Spring to the nearby home of her sister, Mildred Horn, at 13502 North Gate Drive. Mildred was a flight attendant for American Airlines and was scheduled that day for an early flight out of Dulles Airport. As was their custom when Mildred was on flight duty, Ms. Rice had had Mildred's daughter, Tamielle Horn, spend the preceding night with her. Ms. Rice would on such occasions regularly go to Mildred's house in the morning to check on Mildred's disabled son, Trevor Horn.[1] Trevor had a number of problems arising from his premature birth. He had required twenty-four hour nursing care as a result of a case of medical malpractice that occurred when he was approximately thirteen months old, which resulted in severe brain damage and cerebral palsy.

When Ms. Rice arrived at Mildred's residence on March 3, she immediately noticed several things out of place. She noticed that the garage door was open; normally it would not have been. She could see that the door leading from the garage into the family room was also open. As soon as Ms. Rice got out of her car, she heard "the piercing sound of Trevor's apnea monitor."[2] The alarm would sound "[w]hen there was no breath sound transmitted to the machine."

Ms. Rice got back in her car, drove home, and told Tamielle to call 911. She then went to a neighboring house and asked Deborah Falls to accompany her to Mildred's house. Ms. Falls and Ms. Rice then went back together and tried to open the front door. The door would not open all the way, because something was blocking it. When Ms. Rice looked inside, she saw her sister's body "with half of her face blown off." When Ms. Falls looked inside, she also saw Mildred's body. Neither woman entered the house.

---

1. Trevor and Tamielle were twins.

2. An apena monitor is an alarm that sounds when the patient suffers a deprivation of oxygen.

The police arrived shortly thereafter and found the bodies of Mildred; Trevor; and Trevor's nurse, Janice Saunders. Mildred's body was found inside the front doorway, Trevor was in his bed, and Ms. Saunders's body was also found in Trevor's bedroom. The medical examiner advised that both Mildred and Ms. Saunders had died of gunshot wounds to the head, while Trevor had been suffocated. It was undisputed that the cause of death in each of the three cases was homicide.

Mildred Horn had been shot three times in the head, one shot going through the eye and into the brain. Janice Saunders had been shot twice, one of those shots also going through the eye. The reliance of that *modus operandi* would take on significance later in the investigation.

The house had been ransacked, but in a cursory way that gave the appearance of having been staged. A subsequent inventory revealed that only a few items were missing. Among those were check cashing cards and credit cards. No items of value, such as jewelry or video and stereo equipment, were missing. Mildred Horn's five-carat diamond tennis bracelet, lying openly on a bathroom counter, strangely was not taken, nor was Janice Saunders's purse or jewelry. Theft seemed to have been an unlikely motive for the crimes. Mildred's van was also missing, although it was recovered by police on 14322 Rose Tree Court in Silver Spring a short time later. The police found two possible points of entry: 1) the basement window and 2) a set of French doors at the rear of the first floor.

### Suspicion Focuses on The Father and Ex–Husband

Suspicion focused almost immediately on Lawrence Horn, then living in Los Angeles, California. Horn was the ex-husband of Mildred and the father of Trevor and Tamielle. Mildred and Lawrence Horn also had an older daughter, Tiffani, who was living in a Howard University dormitory on the night of the murders.

Although it is unclear from the record when Lawrence and Mildred had been married, it was at some time in the early 1970s prior to Tiffani's birth in 1974. The original marital residence had been Detroit. In 1978, Mildred moved with Tiffani to Maryland, although she did not at that time seek a divorce from Lawrence. Mildred and Lawrence continued to see each other, and Mildred became pregnant in 1984 with Trevor and Tamielle. The couple's relationship apparently broke down during that pregnancy. The twins were born prematurely. Trevor had the most difficulties and was not released from the hospital for approximately six months. Lawrence showed little interest in Trevor, visiting him only three times during his life.

Tiffani described her father as controlling and manipulative in his relationship with Mildred. He was, as of March, 1993, $16,000 in arrears in child support. In fact, Lawrence Horn was not allowed into his ex-wife's house, and communication was conducted primarily through the court system.

## A Strong Financial Motive

Lawrence Horn had a financial motive to wish his son and his ex-wife dead. Trevor had suffered severe brain damage and cerebral palsy as the result of the failed medical procedure that occurred when he was thirteen months old. Mildred Horn had sued the hospital as Trevor's next friend, and a settlement was reached. The attorney for Trevor's estate testified to the terms of the settlement. The gross amount of the settlement was $2,750,000. "There was a provision for attorneys' fees. There was a provision for $350,000.00 to pay medical bills. There was $250,000.00 awarded to [Mildred Horn and] $125,000.00 to [Lawrence] Horn." Lawrence Horn had complained to both his daughter, Tiffani, and to his girlfriend, Shira Bogan, about what he considered to be his inappropriately small share of the settlement. A total of $1,100,000 was held in trust for Trevor, to be paid to him when he reached the age of thirteen.

Lawrence Horn's mother, Pauline, testified to a $65,000 loan she had made to Lawrence to assist him in paying the

"substantial legal fees" he had incurred in "fighting the divorce and custody battle" with Mildred Horn.

A further financial problem had been looming on the horizon as insurance coverage for Trevor's substantial medical and nursing expenses ran out. There had been insurance coverage initially through Lawrence Horn's place of employment, Motown records,[3] but he lost that job at some point. Mildred Horn elected to pay the COBRA[4] on that insurance for the maximum period of time allowed, which was three years. After the COBRA ran out, Mildred Horn was able to keep Trevor insured through her own insurance policy with American Airlines, but at the end of January or the beginning of February 1993, she had used the lifetime maximum benefits for Trevor, which was $500,000. Although she tried to obtain further insurance for Trevor, insurance companies were not willing to provide coverage. Accordingly, by early 1993, the time had come to begin eating into the money from the settlement of the medical malpractice suit for Trevor's continuing health care.

The attorney for Trevor's estate testified that if Trevor were to die, Mildred Horn and Lawrence Horn were each to receive one-half of the estate. If only one parent survived, that parent would receive the entire amount remaining in the estate. The gross value of the estate at the time of Trevor's death was $1,839,920.

### The Timing of the Murders

The time period in which the murders occurred can be narrowed down to the two-hour-and-forty-five-minute period between 2:30 a.m. and 5:15 a.m. on March 3. At 2:00 a.m.,

---

**3.** Lawrence worked for Motown in Detroit, but then moved to Los Angeles. MCA Records took over Motown at some point, and Lawrence then worked for MCA until he lost the job, apparently as the result of downsizing.

**4.** The Consolidated Omnibus Budget Reconciliation Act (COBRA) of 1986 gave certain former employees the right to a temporary continuation of health coverage at group rates.

Janice Saunders, as on-duty nurse, made a notation about Trevor's condition. At 2:30 a.m., Tiffani Horn, from her dormitory room at Howard University, mistakenly called her mother while attempting to call her boyfriend. A neighbor of Mildred Horn testified that Mildred's garage door was open and her van was gone by 5:15 a.m. that morning. At 6:00 a.m., George Murphy, who lived in a townhouse that was about a five-minute walking distance and a two-minute driving distance from the Horn residence on North Gate Drive, observed a van with a handicap tag parked in a reserved parking space on Rosetree Court. The van was identified as that owned by Mildred Horn and taken from her home on the morning of the murders.

Tiffani Horn also testified that at about 10:30 p.m. on March 1, the night before the murders, she had talked by phone with her father in Los Angeles. On that occasion, he persistently probed her for information about when Tiffani's mother and sister, Mildred and Tamielle Horn, would be at home. It was subsequently established that at 2:03 a.m. on the morning of March 3, moreover, Lawrence Horn was making a videotape of his Los Angeles apartment, a tape that significantly included the picturing of the television programs then showing in Los Angeles. If ever needed, he had proof that he was in Los Angeles at that time.

### The Trail Leads From Los Angeles to Detroit And On to Montgomery County

The Montgomery County Police Department and the Los Angeles Police Department together obtained a warrant for the search of Horn's apartment in Los Angeles. After the evidence seized was reviewed by the Montgomery County Police, Detective Craig Wittenberger, the primary detective on the case, requested from AT & T a list of long distance phone calls made to Horn's Los Angeles residence. Four calls of significance were discovered. Two were from Detroit to Horn's residence. The third call to Horn's residence in Los Angeles was from a pay phone at the Days Inn in Rockville at shortly after midnight on March 3. Yet another call to Horn in

Los Angeles was from a pay phone at a Denny's Restaurant across the street from the Red Roof Inn in Gaithersburg at 5:12 a.m. on March 3.

Both of those two calls from Montgomery County used a telephone calling card issued in the name of Camilla McKinney. It was subsequently developed that Camilla McKinney was the false name used by Marsha Webb, Lawrence Horn's cousin, to obtain telephone service from Pacific Bell after having had service in her own name cut off for non-payment of her bills. According to Marsha Webb, she obtained the calling card in the name of Camilla McKinney because Lawrence Horn asked her to do so because he would be traveling back and forth to Rockville and did not want the bills coming to his home address. Webb also testified that she only used the card herself on several occasions at the outset and then gave the card number only to Lawrence Horn.[5]

### The Appellant Enters the Picture

Detective Wittenberger then requested information from the Days Inn and the Red Roof Inn. It was determined that the appellant had registered at the Days Inn at 16001 Shady Grove Road at approximately 12:23 a.m. on March 3, 1993 and checked out at 6:00 a.m. that same morning. The appellant had also stayed at the Red Roof Inn in Gaithersburg on January 27–28, 1993, and on February 7–9, 1993.

When the appellant registered at the Days Inn at just after midnight, he registered in his own name. He gave as his address 13403 Glenfield in Detroit, which turned out to be his actual address. He gave his Michigan tag number as EGR 643, a tag number registered to a Betty Jo Riggs of Lansing,

---

5. The trial of Lawrence Horn was removed from Montgomery County to Frederick County, where a jury, presided over by Judge Ann S. Harrington, convicted him on three counts of murder in the first degree and one count of conspiracy to murder. Horn was sentenced to life imprisonment without the possibility of parole. His convictions were affirmed by this Court in an unpublished opinion. *Horn v. State,* 117 Md.App. 751 (No. 4, September Term, 1996, filed on October 15, 1997), *cert. denied,* 348 Md. 523, 704 A.2d 1244 (1998).

Michigan, who had no knowledge of who the appellant was. Because he was paying by cash, the appellant was required to present identification. He produced a Michigan driver's license, containing his photograph. The appellant subsequently acknowledged that the driver's license presented was, indeed, his own. A Days Inn worker subsequently identified the appellant as also having stayed at the Days Inn on the night of August 22.

## Thomas Turner As the Broker

The plethora of telephone records that linked the appellant and Lawrence Horn inextricably together also ensnared in its web Thomas Turner, also of Detroit. He turned out to be the middleman who brought the appellant and Horn together. Turner testified at the trial under a grant of immunity from the State.

Turner and the appellant had met while serving terms in prison together. They remained good friends. Turner and Lawrence Horn were first cousins, although they had not seen each other for twenty years before a reunion at the home of a mutual cousin in the spring of 1992. Horn subsequently visited Turner at his Detroit home on several occasions. On one such visit, Turner talked to Horn about the appellant, describing him as someone who might be able to help Horn with his domestic problem. Turner gave Horn the appellant's card, which read "spiritual adviser, cold reader, case buster." Turner further facilitated Horn and the appellant in making contact with each other. The appellant later indicated to Turner that he had been in contact with Horn.

After the murders had taken place Horn contacted Turner and indicated that he had to get in touch with the appellant. Turner gave Horn various telephone numbers at which the appellant could be reached. When brought in for questioning in January 1994, Turner called Horn from the Detroit FBI Office. Horn gave him the name of an attorney and further told him that he did not have to say anything.

Turner also testified that he had rented cars for the appellant, who had no credit card of his own, on frequent occasions during the month of December 1992 and the months of January, February, and March of 1993. Specifically, he rented a car for the appellant for the period of March 1 through March 8, 1993.

### A Transcontinental Web Spun With Telephone Wire

The State's case established so tightly interwoven a web of transcontinental communication between the appellant and Lawrence Horn that neither could hope to extricate himself from it. The common denominator of 261 long distance telephone calls was the use of the calling card in the name of Camilla McKinney, the card taken out for the use of Lawrence Horn by his cousin Marsha Webb.

With each one using the same tell-tale calling card, 66 calls were made, during the months preceding and immediately following the murders, from various pay phones in Los Angeles to the residence of the appellant in Detroit. Six other calls were made from pay phones in Los Angeles to Francel's Bar in Detroit, an establishment regularly frequented by the appellant. In the westbound direction, using the same calling card during the same period of time, 70 calls were placed from various pay phones in Detroit to Lawrence Horn's residence in Los Angeles.

The telephonic web also reached out to Montgomery County. Thirteen calls were made from pay phones in Los Angeles to several different motels in the Rockville–Gaithersburg area. Other evidence established that on each occasion, the appellant happened to be registered at the particular motel to which the call had been placed. In the other direction, one call was placed from a Rockville-area motel, at which the appellant was registered, to the residence of Lawrence Horn in Los Angeles. Yet another call was made on another occasion from a Rockville-area motel, at which Lawrence Horn was registered, to the appellant's residence in Detroit.

At 8:57 p.m. on July 20, 1993, a call was made from a pay phone in the Calverton Shopping Center in Beltsville, Maryland, to Francel's Bar in Detroit. On that occasion, Lawrence Horn was observed using the pay phone in question.

### The Center of the Web on March 3

As discussed, the murders occurred at some time between 2:30 a.m. and 5:15 a.m. on March 3, 1993. As discussed, the appellant registered at the Days Inn in Rockville at 12:23 a.m. on March 3 and checked out at 6:00 a.m. that same morning. At 12:11 a.m. on March 3 a call was placed from a pay phone in Rockville to Lawrence Horn's residence in Los Angeles. At 5:12 a.m. that morning, another call was placed from a pay phone in Gaithersburg to Lawrence Horn's residence in Los Angeles. At 11:50 a.m. on March 3, a call was placed from the United States Post Office on Wilcox Avenue in Los Angeles to the Days Inn in Rockville, whence the appellant had checked out six hours earlier. All three of those calls used the calling card of Camilla McKinney.

Two days after the murders, at 3:18 a.m. on March 5, a call was made from a pay phone in Beverly Hills, California, to the appellant's residence in Detroit. In the days that immediately followed, various other calls were made from pay phones in Los Angeles to either the appellant's home in Detroit or to Francel's Bar.

When the appellant was arrested in Detroit, he asked whether anyone else had been arrested. Informed that Lawrence Horn of Los Angeles had been arrested, the appellant responded that he had never heard of Horn.

### $6,000 From a Dead Man

As will be discussed, the "Hit Man" manual apparently favored by the appellant recommended that a hit-man require the up-front payment of expense money of between $500 and $5,000. On five separate occasions between August 18, 1992, and January 28, 1993, either the appellant directly, or his girl friend, Pauline McGhee, on his behalf, received Western Union money transfers in amounts totaling $6,000. The Decem-

ber 4, 1992, payment was received by the appellant directly at the All American '76 Truck Plaza in Breezewood, Pennsylvania, an exit on the Pennsylvania Turnpike whence traffic proceeds south into Maryland. The January 28, 1993, payment was received by the appellant directly at Mailboxes, Etc. in Gaithersburg.

The payer listed on all of the Western Union money transfers was a person named as "George Shaw." The telephone number given by "George Shaw" turned out to be listed to a law firm at 10 Universal City Plaza in Universal City, California. No one named George Shaw had ever worked for that firm. On different occasions, "George Shaw" had given as his address either 6222 or 6255 Sunset Boulevard in Los Angeles. There was no such address as 6222 Sunset Boulevard; 6255 Sunset Boulevard had once been the address of Motown, but no one named George Shaw had ever worked there. Lawrence Horn, however, had once worked for Motown in Los Angeles.

Where did the name "George Shaw" come from? In late July of 1992, Lawrence Horn was aware of the death of Motown star Mary Wells, for Horn and his girlfriend had discussed her death. The obituary for Mary Wells appeared in the July 27, 1992, edition of the *Los Angeles Times.* Immediately beside it was the obituary of George Shaw. The first Western Union money transfer using the name "George Shaw" appeared on August 18, three weeks after the obituary.

### The Hit Man Manual

During the search of the Detroit residence shared by the appellant and Pauline McGhee, the police recovered a catalog from Palladin Press. That catalog advertised a book entitled *Hit Man, A Technical Manual for Independent Contractors.* An employee of the Palladin Press testified that on January 24, 1992, an order was received from the appellant, requesting two books: 1) *Hit Man* and 2) *How to Make Disposable Silencers.* She further testified that the order was processed and that it was Palladin Press's regular practice to fill all orders within 48 hours.

## The *Modus Operandi* Recommended
## And the *Modus Operandi* Used

The correspondence between the *modus operandi* recommended by the *Hit Man Manual* and the *modus operandi* actually used on the early morning of March 3, 1993, is striking. The manual recommended the up-front payments of expense money. The appellant received $6,000 up front. The manual recommended that, if the "hit" is to appear like a burglary, the hit man should "mess up the scene" and take concealable items of value and then dispose of them along with the weapon. Mildred Horn's home was ransacked but in what the police described as a very cursory fashion. Only random items were missing and they were discovered where they had been abandoned. The manual recommended aiming for the head, preferably the eye sockets. Mildred Horn was shot through the eye. Janice Saunders was shot through the eye.

The manual was very specific with respect to the choice and use of weapon. It recommended an AR7 rifle because it is lightweight and easy to conceal when disassembled. Bullet fragments removed from the victims were determined to be consistent with .22 caliber long rifle ammunition. An AR7 rifle "is manufactured to accept and function properly with ... .22 long rifle caliber ammunition."

The manual recommended drilling out the AR7's serial number and disposing of different weapon parts at various locations. On March 26, three weeks after the murders, four separate pieces of what were determined to be die cast aluminum components of an AR7 rifle were found at different spots along the right hand side of Route 28 in Montgomery County. Pieces of the rifle were found in general proximity to where Mildred Horn's Macy's, Hecht's, and Magruder cards were found. An F.B.I. forensic metallurgist was of the opinion that the weapon had been exposed to the surrounding environment for a matter of weeks and that it had been intentionally cut into pieces and disassembled. Holes had been drilled, moreover, in one of the pieces in a manner consistent with the obliteration of the weapon's serial number.

The manual recommended that the hit man, while still at the crime scene, run a rat tail file down the weapon's barrel in order to erase its ballistic signature. On March 3, the police found a metal file on the ground near the wheel chair ramp leading to the deck of Mildred Horn's home. One of its tips had been wrapped with duct tape. The file, moreover, was one that could fit into the barrel of an AR7 .22 caliber rifle. An Alcohol, Tobacco and Firearms forensic chemist testified that the file had been in contact with smokeless powder, a rifle propellant.

### The Defense

The appellant chose not to testify in his own defense. That would seem to have been a wise tactical decision.

### Appellate Contentions In Realistic Perspective

This extensive evidentiary background is important to keep in mind as we take up the appellant's particularized contentions. To characterize the State's case against the appellant as one based on circumstantial evidence would be misleading, for the phrase "circumstantial evidence" might seem to depreciate the strength of the State's case. The State's case was, to be sure, based on circumstantial evidence, but on a tidal wave of circumstantial evidence so overwhelming as to sweep before it any splinter or sprig of doubt that might have presumed to block its path. Realistically, the verdicts of guilty in this case were never in doubt. Realistically, the only issue that hung in the balance was whether the appellant would, as he had on an earlier occasion, be sentenced to death. That larger perspective cannot be ignored as we now take up the particularized contentions.

### The Supplemental Jury Instruction
### On Aiding and Abetting

When the jurors were initially instructed, nothing was told them on the subject of aiding and abetting or on the general law of being a principal in the second degree, notwithstanding the appellant's express request that such instructions be giv-

en. Though chagrined by the absence of an aiding and abetting instruction, appellant's counsel, in closing argument, nonetheless pushed forward with such a theory of the case. Repeatedly, he stressed the fact that no evidence had actually placed the appellant at the scene of the crimes. He expressly argued, moreover, that the available evidence "tells us that there were two people" involved.

It is important to understand why this distinction between types or levels of criminal participation was, at that stage of the trial, of such vital concern to all parties, including the jurors. With respect to the appellant's guilt of murder in the first degree, it made no difference whether the appellant had been a principal in the first degree or a principal in the second degree. What was really at stake was not the appellant's guilt, but the appellant's life. If found to have been a principal in the first degree, the appellant was still eligible for a sentence of death. If found, on the other hand, to have been merely a principal in the second degree—whether such a finding were based on logic or lenity, on fact or on compassion—the threat of death would have been taken off the sentencing table.

Affected by the defense argument on that issue, the jury obviously considered the distinction and, on its fourth day of deliberation, sent the following note to Judge Kavanaugh:

We would like more explanation of homicide first degree, premeditated murder. In particular, the definition states that, "the conduct of the defendant caused the death of Mildred Horn, Trevor Horn, and Janice Saunders." Does this mean that to be guilty, a person had to have been present at the murders and committed a physical act leading to the deaths? Please answer separately for, "present" and for committing a "physical act" that is, pull the trigger and suffocate with pillow.

Judge Kavanaugh discussed the situation with counsel. The appellant, ill-advisedly in our judgment, decided to take a "double or nothing" gamble and objected to the giving of any supplemental instruction, notwithstanding his earlier desire

for such an instruction. The appellant's apparent glimmer of hope was that the jury, if falsely permitted to believe that its only available choice was between principalship in the first degree and a verdict of not guilty, might opt for the not guilty verdict. To us, that would seem to have been a hope born out of desperation and not out of any realistic expectation as to what the jury would likely do. Both the appellant's hope and our skepticism, however, are beside the point. After an overnight adjournment, with an opportunity for counsel to consider and to argue the significance of *United States v. Horton*, 921 F.2d 540 (4th Cir.1990), Judge Kavanaugh decided in favor of giving a supplemental instruction.

THE COURT: Well, for the record, I am giving this aiding and abetting instruction in response to the note from the jury asking for clarification about whether or not they have to find two elements: Whether or not Mr. Perry was present at the scene, and whether or not they have to find that he was the shooter or the person who suffocated Trevor.

Aiding and abetting is a correct interpretation of Maryland law—a person can be guilty as principal in the first degree and principal in the second degree and still be guilty of first-degree premeditated murder.

At this stage we are in the guilt/innocence part. We are not in the sentencing phase of it, and I agree with Mr. Brennan, death penalty cases are different, and it is very important for the jury to be unanimous that Mr. Perry was a principal in the first degree before they can even consider whether or not the death penalty is appropriate; but I think the defense is jumping the gun somewhat to ask for a special verdict sheet at this time. I think that is for a penalty phase, and definitely we will explore it at that time.

As far as whether or not it is appropriate, I think this is the common law of Maryland, principal in the first degree, principal in the second degree, and even the Federal system has a statute charging the accessory.

Every time someone is charged with first-degree premeditated murder, the charge is principal in the first and second degree—different theories, but it is no different legally.

So with that caveat, I am going to bring the jurors in and give them this instruction and allow argument.

Judge Kavanaugh then gave the following instruction on the subject of aiding and abetting:

The defendant is charged with a crime of first degree murder. *A person who aids and abets in a commission of a crime is as guilty as the actual perpetrator even though he did not personally commit each of the acts that constitutes the crime.* A person aids and abets the commission of a crime by knowingly associating with the criminal venture with the intent to help commit the crime, being present when the crime is committed and seeking by some act to make the crime succeed.

In order to prove that the defendant aided and abetted the commission of a crime, the State has the burden of proof of two elements: One, that the defendant was present when the crime was committed; and two, that the defendant willfully participated with the intent to make the crime succeed.

Presence means being at the scene or close enough to render assistance to the other perpetrators. Willful participation means voluntary and intentional participation in the criminal act. *Some conduct by the defendant in the furtherance of the crime is necessary.* The mere presence of the defendant at the time and place of the commission of the crime is not enough to prove that the defendant aided and abetted, but if presence is proven, it is a fact that may be considered along with all of the surrounding circumstances.

(Emphasis supplied).

Following the reinstruction, counsel were permitted and, indeed, made supplemental arguments to the jury. The jury subsequently returned verdicts of guilty on all charges. At the sentencing hearing before the same jury the following month, the jury was asked whether it was "proven or not

proven" that the appellant was a principal in the first degree to the murders. The jury responded, "Not proven," and the sentence of death was thereby precluded.

The appellant does not now object to the fact that the instruction in issue was supplementary rather than original. The discretionary authority of a judge to give a supplementary instruction, if otherwise proper, is not in issue. The appellant does not challenge the substantive content of the instruction. The exclusive objection is that the legal issue dealt with by the instruction was not one generated by the evidence in the case.

We hold that the appellant's contention in that regard is flawed. It is, indeed, twice flawed, once with respect to the controlling law and yet again with respect to its factual predicate.

### A. Creating a New and Converse Rule

The appellant relies on Maryland Rule 4–325(c), which provides:

*The court* may, and *at the request of any party shall, instruct the jury as to the applicable law* and the extent to which the instructions are binding. The court may give its instructions orally or, with the consent of the parties, in writing instead of orally. The court need not grant a requested instruction if the matter is fairly covered by instructions actually given.

(Emphasis supplied).

Even if we were to assume, *arguendo*, that there was no evidence to support the possibility that the appellant had been a second-degree principal merely aiding and abetting someone else who was the principal in the first degree, even a totally unnecessary and gratuitous instruction on aiding and abetting would still not offend Rule 4–325(c). Rule 4–325(c) does not even deal with unnecessary, gratuitous, or irrelevant instructions.

The rule states clearly that if a party timely requests an instruction, it is error not to give the instruction (or its equivalent) if it is generated by the evidence. It is error to do

too little, but the rule does not make it error to do too much. It does not even address the subject of doing too much. With respect to the supplementary instruction now in issue, the dispositive answer is that the appellant did not request it. There was, therefore, no possible way that the appellant could be denied an instruction to which he was entitled. Rule 4–325(c) addresses no other problem.

None of the cases cited by the appellant, *Binnie v. State*, 321 Md. 572, 583 A.2d 1037 (1991); *Sims v. State*, 319 Md. 540, 547–55, 573 A.2d 1317 (1990); *Dykes v. State*, 319 Md. 206, 220, 571 A.2d 1251 (1990), is even applicable. Those cases all deal with the situation in which 1) the defendant requested an instruction; 2) the trial judge declined to give the instruction; and 3) the appellate issue became that of whether the judge's declination to instruct was justified because an issue had not been generated, or was erroneous because an issue had been generated. The only issue in each case was whether the defendant had been denied an instruction to which he was entitled.

What the appellant is attempting to do, perhaps subconsciously, is not to invoke Rule 4–325(c) as written but to create a new rule which would be a converse to Rule 4–325(c). If, all other conditions being satisfied, the present rule makes it error **NOT TO INSTRUCT WHEN THE ISSUE IS GENERATED,** the converse rule would make it error **TO INSTRUCT WHEN THE ISSUE IS NOT GENERATED.**[6] Whatever the virtues of such a hypothetical new rule might be, it is not a rule that the Rules Committee or the Court of Appeals has ever promulgated.

When it comes to jury instructions, under-inclusion may be reversible error but over-inclusion, lamentably perhaps, has become an ingrained habit. Using the many aspects of homicide law as an example of excess, this Court in *Evans v. State*,

---

**6.** It may be a sin (sloth) not to get up in the morning when the sun is shining. That does not make it a sin to get up in the morning when the sun is not shining.

28 Md.App. 640, 665, 349 A.2d 300 (1975), commented on the all-too-true reality that

> boiler-plate instructions have been handed down from judicial generation to judicial generation and solemnly intoned whether they have any bearing on the case then at bar or not.

We went on, moreover, 28 Md.App. at 665 n. 9, 349 A.2d 300, to describe the cause:

> Whenever a "canned" set of jury instructions is resorted to, the man behind the can has an all-too-frequent way of going intellectually onto "automatic pilot." Once the liturgy begins, it will drone on to its bitter end, running the full gamut of homicidal mental states, the immaterial as well as the material.

For his proffered new proposition that it is error to instruct the jury on defenses or aspects of law not generated by the evidence presented, the appellant can cite only a *dictum* from the opinion of this Court in *Tripp v. State*, 36 Md.App. 459, 463, 374 A.2d 384 (1977), that it is "inappropriate to instruct upon a principle of law not suggested by the evidence in the case." We are poignantly familiar with *Tripp*, and we know that we did not remotely propound the principle for which the appellant cites it as authority. There is a world of difference between what may be "inappropriate" and what is "reversible." In *Tripp* we were not pronouncing error but only breathing a sigh of regret, as we noted, 36 Md.App. at 462, 374 A.2d 384:

> The appellant observes that it has been the ingrained habit of many members of the judiciary, when instructing a jury on the subject of homicide, to catalog all the varieties thereof, defining each and setting out the penalty for each. *The observed phenomenon, sadly to relate, is true; it is also unfortunate.*

(Emphasis supplied).

Our conclusion as to excessive and frequently unnecessary jury instruction was 1) that the phenomenon is sad, 2) that it is unfortunate, and 3) that it nonetheless happens all the time.

It has never been suggested that it is reversible error. A rule requiring a necessary instruction does not forbid an unnecessary instruction. It is under-inclusion that runs the risk of error. Over-inclusion only runs the risk of boredom.

Actually there is some justification for some of the overly inclusive instructions that are frequently given. In doubtful or ambiguous situations, the discreet thing to do is to tell the jury more than it needs to know rather than run the risk of denying the jury necessary knowledge. When in doubt, it is better to err on the side of over-inclusion rather than under-inclusion. That is why over-inclusion has never been made the occasion for reversible error. We are not about to alter course today.

## B. Generating An Issue Downward as to Lesser Guilt or Lesser Involvement

Even assuming, purely *arguendo*, that it would be error to instruct on a principle of law not generated by the evidence, the appellant is still advancing a curious proposition. He acknowledges a genuinely generated and, indeed, legally sufficient case of involvement at the greater (and potentially lethal) level of being a principal in the first degree. Both greater guilt and greater involvement subsume within them, however, a lesser guilt and lesser involvement. With respect to levels of guilt or levels of involvement, proof moves upward, not downward. Once the higher plateau has been reached, for a verdict then to be returned of guilt or of participation at a lower level, it is only necessary for there to be a reasonable doubt as to guilt or participation at the higher level, and not affirmative disproof of the greater guilt or participation. To generate an issue upward may require additional evidence; to generate an issue downward does not.

A compassionate jury on the death penalty issue, for example, is not required to find, beyond a reasonable doubt, that a defendant is **NOT** the triggerman in order to give him the benefit of the doubt as a mere principal in the second degree. Proof of guilt as a second-degree principal may

represent nothing more than proof of guilt as a first-degree principal by a bare preponderance of the evidence.[7]

■ A finding that the appellant in this case was a principal in the second degree may have entailed nothing more than a reasonable doubt as to whether he was a principal in the first degree. It did not require an affirmative finding, beyond a reasonable doubt, that someone else was the principal in the first degree. All that may have been involved was a failure of persuasion (or overt leniency) as to an element of what would have constituted greater guilt or more immediate involvement. It need not have involved alternative evidence. It may only have involved, for a variety of reasons, lesser persuasion.

■ It is never an escape from a lesser guilt or lesser involvement to prove or to. argue a greater guilt or involvement. It is not a valid defense to be more guilty than charged or more guilty than proved. The appellant in this case may not now prevail on the theory that he could not have been a principal in the second degree for the reason that he was actually the principal in the first degree.

A genuine jury issue as to guilt or involvement at a higher level *ipso facto* generates the possibility of a verdict of guilt or involvement at a lower level and thereby makes that possibility a genuine issue in the case. The generation of this issue at the lower level does not necessarily require affirmative disproof of guilt or involvement at a higher level. There is a vast difference between 1) generating the issue that the appellant was **at least** a principal in the second degree and 2) generating the very different issue that the appellant was **nothing more than** a principal in the second degree. The former issue requires generation; the latter does not. The appellant's contention that the instruction was not supported by the evidence fails as a matter of legal logic.

---

7. A familiar definition of second-degree murder is first-degree murder by a bare preponderance of the evidence.

## C. The Issue Was Factually Generated

The appellant's contention also fails at a more mundane level. Assuming, *arguendo*, 1) that it would be error to instruct on a principle of law not generated by the evidence and also assuming, *arguendo*, 2) that generating an issue as to second-degree principalship requires affirmative evidence of nothing more than that level of participation, the evidence in this case did affirmatively generate just such a possibility.

In this regard, we have a preliminary observation to make about this appeal. If, *arguendo*, we were called upon to make such an evidentiary assessment, we would look at the evidence in the case and make a determination, as a matter of law, as to whether it had generated a *prima facie* case of the appellant's having been a principal in the second degree. No one else's assessment of the evidence would matter in the slightest.

We cannot help but wonder, therefore, why the appellant wastes half of his argument on this contention in repeatedly telling us that 1) Judge Kavanaugh initially thought the evidence did not generate the issue and 2) the State initially thought (or said it thought) the same thing. If such opinions mattered, the State might well respond by pointing out that the appellant himself initially thought (or said he thought) that the evidence did, indeed, generate the issue and, therefore, it must be so. We are not talking about estoppel. We are talking about whether the evidence generated an issue. Without meaning to be cavalier, we would be required, *arguendo*, to resolve this question for ourselves, and we would not care 1) what the State thought, 2) what the appellant thought, or 3) even what the trial judge thought. Pointing out an opponent's inconsistencies on the issue, therefore, is just a lot of extraneous clatter.

If the appellant is obliquely suggesting that the State's earlier opposition to an aiding and abetting instruction somehow estopped it from later benefitting from such an instruction, the point has no merit. In the first place, the State never requested the supplementary instruction. The jury did.

Judge Kavanaugh, *sua sponte,* decided to give the supplementary instruction.

The situation closely resembles· that before the Fourth Circuit in *United States v. Horton,* 921 F.2d 540 (4th Cir. 1990). One of the reasons given by Horton for claiming error in the giving of a supplementary instruction on aiding and abetting was his claim "that the giving of the instruction was precluded by the government's tactical decision not to advance a theory of aiding and abetting but instead to argue that Horton was the principal." 921 F.2d at 543. In rejecting that claim, Judge Wilkinson wrote for the Fourth Circuit:

> Appellant argues, however, that the aiding and abetting instruction should not have been given because the government's theory of the case had always been that Horton was the principal. In Horton's view, the government's tactical decision to try the case in this manner prevented it from · requesting an aiding and abetting instruction, even if there was sufficient evidence to support it. While appellant correctly states that when a party chooses not to advance a particular theory, it is not *entitled* to an instruction on that theory even if there is evidentiary support for the theory in the record, *the court is not precluded from giving any instruction for which there is evidentiary support. The fact that a party did not pursue a particular theory does not preclude the trial judge from giving an instruction on that theory where it deems such an instruction to be appropriate.*

921 F.2d at 544 (emphasis supplied).

In this case, it was by no means a foregone conclusion that the appellant was necessarily a principal in the first degree. As appellant's counsel astutely pointed out in final argument, there was not a shred of evidence actually placing the appellant at the crime scene. The appellant expressly argued, moreover, that there were "two persons" at the scene. The case against the appellant was exclusively, albeit overwhelmingly, circumstantial. That the appellant was somehow involved in the crimes was a certainty. That he was the actual triggerman was only an inference, a very persuasive inference,

to be sure, but an inference that could be drawn or could be declined.

The jury necessarily was called upon to engage in intelligent speculation. Just as it would have been reasonable for the jury to have concluded that the appellant acted alone, it was also conceivable that he could have brought with him from Detroit Thomas Turner, his former friend from prison and his contact with Lawrence Horn. It is also conceivable that, through some sort of criminal networking, he could have subcontracted for the assistance of some local thug for the early morning of March 3, 1993. These possibilities left open-ended the appellant's precise level of actual participation at the crime scene.

Again, in significant ways, this case parallels *United States v. Horton.* The evidence there strongly suggested that Horton was the principal in the first degree, but there was residual doubt. The trial judge initially did not give an aiding and abetting instruction. In response to a subsequent inquiry from the jury, however, the judge, over defense objection, gave a supplemental instruction. Horton's contention, 921 F.2d at 543, anticipated the appellant's contention in this case.

Horton contends that the giving of the supplemental aiding and abetting instruction was impermissible. First, *he argues that the instruction should not have been given because there was no evidentiary foundation for it.*

(Emphasis supplied).

Pointing to the uncertainty surrounding the level of Horton's involvement, the Fourth Circuit placed its imprimatur on the giving of the supplementary instruction.

This case is thus a classic one for an aiding and abetting instruction—the commission of a criminal offense is not in doubt, but the identity of the principal may be unclear, and the defendant's participation in the venture can be established by the evidence.

921 F.2d at 544.

The *Horton* decision makes it very clear that uncertainty merely as to a defendant's level of participation in a crime does not entitle the defendant to an acquittal.

On the facts of this case, there can be no doubt that all of the jurors found that Horton was an active participant in the murder of Hoston, a finding sufficient to support a verdict of first degree murder. Only one act—the stabbing murder of Hoston—was charged. Only evidence pertaining to this one act was presented. To convict Horton, the jury had to find that defendant was at the scene, actively participating in the crime of murder with the necessary mens rea. *Whether some jurors found Horton guilty as a principal, believing that he delivered the fatal blow to the heart, while other jurors found him guilty as an aider and abettor, doubting exactly who delivered the fatal blow, is not controlling.*

921 F.2d at 545 (emphasis supplied). See also *United States v. Eagle Elk,* 820 F.2d 959, 961 (8th Cir.1987) ("even if the jury was divided on whether Eagle Elk committed the principal crime or aided and abetted in its commission, there can be no question that the illegal act was murder"); *United States v. Peterson,* 768 F.2d 64, 67 (2d cir.1985).

The jury in this case could, moreover, have thought it more likely than not that the appellant had acted alone, but still have stopped short of thinking so with that certitude required by the "beyond a reasonable doubt" standard. By virtue of its circumstantial nature, the evidence inevitably generated a variety of possibilities. An instruction broad enough to cover the various possible levels of participation would seem, therefore, to have made eminently good sense.

Uncertainty as to the level of the appellant's participation would not dictate his acquittal and that would seem to be the only prejudice this contention might be suggesting. The appellant was not entitled to the "long shot" that a jury, solely through ignorance, might have made a mistake in his favor. Uncertainty would, at most, have entitled the appellant to the benefit of the doubt as to his level of participation. He actually got the benefit of the doubt on that issue and it was that which shielded him from the possibility of a death sentence. It is with ill grace that he now complains.

It follows that with respect to the giving of the supplementary instruction on aiding and abetting, we see no error.

## The Refusal to Sign a Fingerprint Card

 Ironically, for a case as serious as this, one involving three contract murders in the first degree, the appellant's second contention plumbs the nadir of triviality. The appellant was arrested in Detroit on July 19, 1994. After being shipped back to Maryland, he was processed and fingerprinted on August 22 by Sergeant Julie Funt of the Montgomery County Sheriff's Department. The card on which the appellant's fingerprints and certain biographical data were recorded had a place for the appellant's signature. When asked to sign the card by Sergeant Funt, the appellant refused. Sergeant Funt, over the appellant's objection, testified to that refusal.

The appellant now claims that Judge Kavanaugh's allowance of that testimony entitles him to a new trial. Although our reaction to such a claim might instinctively be, "So what?," we will, rather than risk inelegance, go on to the merits. In terms of the merits, it is as if Hermann Goering, at Nuremberg, had been discourteous to a sentry. To suggest that even the erroneous admission of such an evidentiary factoid might overturn the Judgment at Nuremberg is absurd. Even so is it here.

On the merits, the appellant argued that the refusal to sign was irrelevant. The State responded that the defense had opened the door by painting a false portrait of the appellant as an exemplar of helpful cooperation. "For someone who has been so cooperative as the defense tried to make him during the cross-examination of [F.B.I.] Agent Rob Casey, perhaps he is not always so cooperative." The State argued that it wanted the refusal to sign in evidence "to show he is just not a cooperator." If Judge Kavanaugh had been required to balance probative value against unfair prejudice, she would have needed apothecary scales. Although, with the benefit of longer perspective, we wonder both why the State bothered and why the appellant cared, there was enough marginal relevance to save Judge Kavanaugh's ruling from being a clear abuse of

discretion. Whichever way she had ruled, she would not have abused her discretion. This is classically the type of ruling toward which appellate courts are happily deferential.

The appellant secondarily claims that the ruling constituted reversible error because the refusal to sign the fingerprint card was evidence of a "bad act." Judge Kavanaugh stated emphatically, "It is not a prior bad act." Equally emphatically, we do not hesitate to state, *ex cathedra*, that this snippet of irascibility did not constitute a "prior bad act."

### Supplemental Jury Argument And Non–Preservation

The appellant's third contention is a non-starter. He makes reference to comments during the supplemental argument permitted both counsel following the giving of the supplementary jury instruction on aiding and abetting. The State, with a "weather eye" toward the sentencing that lay ahead, continued to maintain its original position that the appellant was a principal in the first degree rather than a mere aider and abettor of someone else. The death penalty was still very much in play. Accordingly, the State continued to emphasize that the "uncontradicted" evidence, with "nothing to the contrary," was that, on March 3 in Montgomery County, the appellant had acted alone. From these characterizations, the appellant confects his present argument that the State thereby asked the jury to draw an adverse inference from his failure to take the stand and thereby trampled underfoot the Fifth Amendment privilege against compelled self-incrimination.

Although we do not sense in the wind so much as a whiff of merit in the contention, we need not engage in any analysis of it. The appellant never made any objection to Judge Kavanaugh, during argument or afterward. Judge Kavanaugh, therefore, was never called upon to make any kind of a ruling. Nothing has been preserved for appellate review. Maryland Rule 8–131(a).

The appellant nonetheless, in a single unilluminating sentence, asks us to exercise extraordinary discretion and to

invoke the so-called "plain error" exemption from the preservation requirement. We decline to do so. That is the full extent of our holding with respect to this contention. Our further comment on the delusive phantom of plain error is only *dicta*.

## Indeed, We May Take Notice, But Why Would We Wish To?

The number of occasions on which we are asked to invoke the "plain error" exemption from the otherwise foreclosing effect of non-preservation remains so epidemic that it behooves us periodically, as forcefully as we know how, to do what we can to limit the contagion.

In *Austin v. State*, 90 Md.App. 254, 258, 600 A.2d 1142 (1992), we seized the occasion "to restate in a published opinion the hierarchical relationship between the [non-preservation] rule and its [plain error] exception because the exception, through promiscuous indulgence, periodically threatens to swallow the rule." In *Williams v. State*, 34 Md.App. 206, 207–08, 366 A.2d 399 (1976), we had described that phenomenon of "promiscuous indulgence":

"Whenever a door is left slightly ajar, there is irresistible temptation on the part of bar, and sometimes even bench, ever to widen the breach. The process is gradual and each progressive nudge imperceptible when viewed alone. What began, however, as a door almost, though not quite, closed is suddenly perceived to be a door almost, though not quite, wide open."

Although the discretion in an appellate court to notice or to decline to notice "plain error" is both unfettered and unreviewable, we undertook, in *Austin*, to set out, on a purely informal basis, some of the guidelines that from time to time may influence our exercise of discretion.

In the expectation that conscientious lawyers will not wish to raise appellate contentions that will be nothing more than exercises in futility, we point out, as guideposts, some of the

more typical considerations that from time to time may influence our exercise of discretion.

90 Md.App. at 267, 600 A.2d 1142.

 Among the guidelines is the egregiousness of the alleged error. In *Williams v. State*, 34 Md.App. at 211, 366 A.2d 399, we tried to give some insight into the distinction between routine, albeit reversible, error and truly extraordinary error. Every error that, if preserved, might have led to a reversal does not thereby become extraordinary. There is a naive assumption that if a contention would prevail on its merits that it should be noticed under the "plain error" exemption, even if not preserved. Reversible error, however, is assumed, as a given, before the purely discretionary decision of whether to notice it even comes into play.

"While we might choose not to notice some inartful or garbled definition of that indefinable abstraction called 'proof beyond a reasonable doubt,' we should almost certainly notice an erroneous instruction that presumed a defendant to be guilty until proved innocent and which placed upon him the full burden of proving his innocence upon the ultimate merits. Where error is flagrant and outrageous, we retain the residual option to notice it and to intervene. *It is the extraordinary error and not the routine error that will cause us to exercise the extraordinary prerogative.*"

(Emphasis supplied).

In *Austin*, we referred to the factor of "the probable impact of an error upon the fortunes of" the defendant. In explaining what might activate our exercise of discretion, we sought to distinguish the arguably erroneous conviction of an unquestionably guilty person and the arguably erroneous conviction of a possibly innocent person.

*We would be inhuman if we would not be more moved to intervene in the case of a probably erroneous conviction of a true innocent than in a case where the error only facilitated the conviction of a clear miscreant.* It is not to disparage unfairly *the latter concern* to acknowledge that it *is,* in any event, *less weighty than the former.* Granting the

appellant the benefit of his most strained and attenuated hypothesizing, he could only persuade us that, as he shot his victim twice in the head, he intended not murder but mayhem. That hardly engenders a sense of outraged innocence.

90 Md.App. at 269–70, 600 A.2d 1142 (emphasis supplied).

Without condoning either one, there is a moral distinction between an erroneous conviction of one who is almost certainly guilty and an erroneous conviction of one who is quite possibly truly innocent. Such moral, even if extralegal, distinctions do influence the exercise of discretion.

A big factor described in *Austin* was that of "lawyerly diligence or dereliction," as we observed:

We are persuaded of no good reason why counsel in this case should not be held to the same standard for knowing the law as counsel, in turn, would hold the trial judge.

Resourceful advocates frequently urge upon us the desirability of noticing "plain error" as a needed sanction against judges who fail to state the law with full accuracy. That argument overlooks the concomitant desirability of holding fast to the rigors of Rule 4–325(e) as a needed sanction against lawyers who fail to spot the issues except in hindsight, who fail to focus the attention of the judge upon the issues, and who fail to make a proper record for appellate review. *They must never be lulled into the sense of false security that the notice of "plain error" is routinely available to pull neglected chestnuts out of the fire.* The sanction cuts both ways.

90 Md.App. at 271, 600 A.2d 1142 (emphasis supplied).

■ We also mentioned as a very important factor in the exercise of appellate discretion the utility of a contention to serve as a vehicle to explore some undeveloped area of the law.

On rarer occasions, we might even be influenced by the opportunity which the notice of "plain error" might afford to illuminate some murky recess of the law. *The interpreting and molding of the law is as weighty a consideration in*

*appellate councils as is the correction of error in individual cases.*

90 Md.App. at 271, 600 A.2d 1142 (emphasis supplied).

All of this brings us down to a truism about appellate psychology that most appellants seem stubbornly unwilling to comprehend. When invoking unreviewable discretion, the arguments must appeal as much, if not more, to what the judge feels as to what the judge thinks. Appellants, however, treat the legal argument in a "plain error" case just as if it had been preserved for review and just as if a reviewing panel were champing at the bit for a chance to address it. They blithely ignore the very real question of why the reviewing panel, if not required to address an issue, would wish to do so.

In *Jeffries v. State,* 113 Md.App. 322, 325–26, 688 A.2d 16 (1997), we tried to explain the chasm of difference between due process and gratuitous process and the different mind sets that reviewing judges, in the exercise of their discretion, in all likelihood bring to bear on those two very different phenomena:

When due process demands, the law will reverse the conviction of an undisputed and cold-blooded killer even on a technicality, *because it must.* A critical component of that principle, however, is the qualifying clause "because it must." It is not with any sense of satisfaction that a court reverses on a technicality. When it does so, it does so reluctantly and with heavy heart, and *only because it must.* The philosophical converse is that when the procedural posture of an issue makes a reversal on a technicality a consequence that is not compelled but only gratuitously permitted, a court is frequently not motivated to be thus gratuitous.

There is a vast philosophical, as well as legal, distinction between due process and gratuitous process. There are procedural requirements that must be satisfied before *process* literally becomes *due.* For a reviewing court to overlook a precondition for review or to interpret loosely a procedural requirement, on the other hand, is an indulgence

in favor of a defendant that is purely gratuitous. Even those who are indisputably factually guilty are entitled to due process. By contrast, only instances of truly outraged innocence call for the act of grace of extending gratuitous process. This appeal is not a case of outraged innocence qualifying for an act of grace.

(Emphasis in original).

Using *Jeffries v. State* as a guideline, we similarly declined in *Fisher and Utley v. State*, 128 Md.App. 79, 736 A.2d 1125 (1999), to utilize the "plain error" exception in order to overlook non-preservation, even though we had the discretion to do so. Although not required to ventilate our inner psychology, we made one of our reasons for declining to overlook non-preservation very clear:

> *This was a bad case*, one resulting in the tragic death of a nine-year-old girl and the equally tragic psychological scarring of a fifteen-year-old girl. The criminal agency of *the three appellants* is not in dispute. They *were unquestionably to blame for the barbaric treatment of two little girls* who were deserving of their protection. Under the circumstances, *this is not a case of "outraged innocence qualifying for an act of grace."*

128 Md.App. at 107–08, 736 A.2d 1125 (emphasis supplied).

At the outset of this opinion, we recounted the factual background of the case in full and meticulous detail. We explained that the reason we did so was because of the bearing that that factual background might have on our resolution of the appellant's first contention, dealing with the supplementary jury instruction, and on the appellant's third contention, the non-preserved challenge to the State's jury argument, the contention that we have declined to review.

The overwhelming evidence of the appellant's guilt and the atrocious character of three cold-blooded murders in the first degree unquestionably have an influence on our exercise of discretion as to whether to overlook the non-preservation of any contentions he might raise. The appellant points out to us that, even though not required to do so, we can "use the

plain error doctrine to consider any error of law even though the issue was not objected to at the trial level." Of course, we can. What the appellant does not point out to us is any persuasive reason why, in a case such as this, we would wish to do so.

### The Right of Allocution Does Not Embrace
### A Required Antecedent Catechism

The appellant's final contention is that, prior to being sentenced, he was denied his right to allocution. The contention itself is a bit of a stretch. Nobody denied the appellant anything. At sentencing, the appellant never stood up, personally or through counsel, to address the jury or the judge and was told to sit down and keep quiet. The appellant, personally or through counsel, never requested permission to speak and had that request denied.

The appellant cites both *Harris v. State,* 306 Md. 344, 358, 509 A.2d 120 (1986) and *Thanos v. State,* 330 Md. 77, 87–90, 622 A.2d 727 (1993), which are hymns of praise to allocution. See also *Clermont v. State,* 348 Md. 419, 444–52, 704 A.2d 880 (1998); *Hunt v. State,* 321 Md. 387, 435, 583 A.2d 218 (1990); *Booth v. State,* 306 Md. 172, 198, 507 A.2d 1098 (1986). We fully concur that the opportunity for allocution is a valued procedural right. We further hold that the appellant enjoyed the benefit of that right. He was fully entitled, had he chosen to do so, to stand up and tell the jury anything he wished. He chose to keep quiet, which was, coincidentally, also his right. Pursuant to the Fifth Amendment, he was not obligated to speak, to wit, to allocute.

What the appellant is really arguing for, at least by way of appellate afterthought, is not the right of allocution *per se,* but the further procedural accoutrement of being informed by the trial judge and on the face of the record of the right to allocution. He claims an entitlement to receive a formal catechism from the bench. The question before us becomes that of whether the right of allocution necessarily is burdened with any such procedural or instructional impedimenta.

The pertinent Maryland Rule, governing sentencing procedures in potentially capital cases, is Rule 4–343(f), which provides:

(f) **Allocution.** Before sentence is determined, the court shall afford the defendant the opportunity, personally and through counsel, to make a statement, and shall afford the State the opportunity to respond.

A handful of decisions, not particularly illuminating, all indicate that if there is neither a request for allocution before sentencing nor an express objection to the absence of allocution immediately afterward, the issue is waived. *State v. Calhoun,* 306 Md. 692, 699–704, 511 A.2d 461 (1986); *Logan v. State,* 289 Md. 460, 487, 425 A.2d 632 (1981); *Robinson v. Warden,* 242 Md. 171, 172–73, 218 A.2d 217 (1966). None of those decisions remotely suggests a *sua sponte* obligation on the trial judge to deliver a catechism.

Even under the common law right of allocution, the nature of which was first addressed by the Court of Appeals in *Dutton v. State,* 123 Md. 373, 91 A. 417 (1914), there was no affirmative requirement on the trial judge to raise the issue of allocution *sua sponte.*

"*[I]t is not reversible error, even in capital cases, not to ask the prisoner if he has any reason to give why sentence should not be passed,* unless it is apparent that the prisoner was or may have been injured by the omission."

123 Md. at 383, 91 A. 417 (emphasis supplied).

*Harris v. State,* 306 Md. at 356–57, 509 A.2d 120, pointed out that subsequent caselaw, applying both the common law right to allocution and the Maryland rule of court after 1962, actually lowered the requirements of *Dutton* and treated the failure of a defendant to assert the right as an absolute waiver of the right. Chief Judge Murphy articulated the Maryland standard:

*Dutton* and its progeny thus embody the common law right of allocution as it existed when we adopted Md. Rule 761 in 1962. . . .

Our cases applying the Maryland rules governing allocution have altered the principles of *Dutton* to some extent. We have previously indicated that, *because the right of allocution is not a fundamental right secured by either the federal or state constitution, it is waived if not asserted by the defendant before sentencing.* This principle of waiver is equally applicable to the common law right of allocution, and supersedes the "actual or potential injury" standard of *Dutton.*

(Emphasis supplied).

The appellant's best hope is to analogize Rule 4–343(f) to Rule 4–342(e), which deals with allocution generally in the context of non-capital sentencing. Those sentencing situations arise far more frequently and, as a result, there is more by way of interpretive caselaw. Rule 4–342(e) provides:

(e) **Allocution and information in mitigation.** Before imposing sentence, the court shall afford the defendant the opportunity, personally and through counsel, to make a statement and to present information in mitigation of punishment.

That provision is essentially verbatim to Rule 4–343(f). There is no substantive distinction between the two provisions.

Time was, before the present allocution rule was adopted in 1984, that the appellant would have had a point. Between 1977 and 1984, the predecessor rule mandated the judicial delivery of a catechism, something that neither Rule 4–342(e) nor Rule 4–343(f) now does. The then-prevailing Rule 772(c) read:

"Before imposing sentence *the court shall inform the defendant that he has the right, personally and through counsel, to make a statement and to present information in mitigation of punishment,* and the court shall afford an opportunity to exercise this right."

(Emphasis supplied).

During that pre–1984 period, the affirmative requirement was on a trial judge personally to inform a defendant of the right to allocution. A failure of the trial judge so to inform

resulted in an appellate vacating of the sentence and a remand for resentencing. *Kent v. State,* 287 Md. 389, 391–96, 412 A.2d 1236 (1980); *In Re Virgil M.,* 46 Md.App. 654, 656–59, 421 A.2d 105 (1980); cf. *Brown v. State,* 11 Md.App. 27, 30–31, 272 A.2d 659 (1971).

The promulgation of Rule 4–342 in 1984, however, removed that requirement. Any doubt as to the significance of that change in the rule's provisions was removed by *State v. Lyles,* 308 Md. 129, 132–34, 517 A.2d 761 (1986). Four separate sentencing appeals were consolidated by the Court of Appeals in the *Lyles* opinion. In each case, the defendant had been sentenced without having been affirmatively advised by the judge of his right to allocution. In each case, the Court of Special Appeals had, for that reason, vacated the sentence and remanded for resentencing. The Court of Appeals granted certiorari "to consider questions of public importance." It framed a key issue before it:

> The question, common to all the cases, is whether a sentence must be vacated for the court's failure to advise a defendant that he has the right, personally and through counsel, to speak in mitigation of punishment where the defendant made no request to make a statement and no objection to the sentencing procedure.

308 Md. at 131, 517 A.2d 761.

In reversing the four decisions of this Court, Judge Couch's opinion contrasted the express requirement of the former rule with the absence of any such requirement in the present rule.

> In our view *there is simply no requirement that the court inform the accused of his right to allocute under the present rule.* Rule 4–342 is somewhat different than former Rule 772(c). *The former rule, by its terms, required the court to inform an accused that he has the right,* personally and through counsel, to make a statement and to present information in mitigation of punishment before sentence was imposed. The rule also required the court to afford the defendant an opportunity to exercise this right. *The requirement that the court inform the accused of this right*

*was eliminated in the present version of the rule* leaving only the requirement that an opportunity to make a statement be afforded.

308 Md. at 133, 517 A.2d 761 (emphasis supplied).

The holding of the Court of Appeals was unambiguous that there is no requirement that the judge inform a defendant of the right to allocution.

The rule was changed, however, and is unambiguous; the requirement of *informing* the accused was eliminated while the requirement of *affording an opportunity* was retained. The rule says what it says; the Court of Special Appeals erred in concluding that the rule required the court to *inform* the accused of his right to make a statement in mitigation of punishment.

*Id.* (emphasis in original).

The Court of Appeals went on to observe that the defendants not only could not prevail on the merits of the issue but, further, were procedurally foreclosed, because of non-preservation, from even raising the issue.

Furthermore, a court's failure to ask a defendant, who is represented by an attorney, whether he has anything to say before sentence is imposed is not a jurisdictional error. *Hill v. United States,* 368 U.S. 424, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962). Md. Rule 885 provides that, aside from questions concerning the jurisdiction of the circuit court, "[t]his Court will not ordinarily decide any point or question which does not plainly appear by the record to have been tried and decided by the circuit court." *Since the defendants made no objection to the alleged error at trial and made no proffer as to the contents of any desired allocution, the issue was not presented to the trial court. Consequently, it was not properly before the intermediate appellate court and is not now before this Court.*

308 Md. at 134, 517 A.2d 761 (emphasis supplied).

In *Fuller v. State,* 64 Md.App. 339, 495 A.2d 366 (1985), the Court of Special Appeals took the very position being urged

by the appellant in this case. The appellant there had complained

that neither he nor his attorney was permitted to speak in mitigation of sentence. *He correctly points out that "both judges rendered their factual findings and, in the very next breath, reimposed the original sentences."* He urges vacation of the sentences and remand for resentencing.

64 Md.App. at 356–57, 495 A.2d 366 (emphasis supplied).

This Court, interpreting Rule 4–342(d), as presently worded (albeit now recodified as 4–342(e)), held that the failure of the trial judge expressly to ask the defendant if he wished to be heard amounted to a denial of the right of allocution.

Unlike in *Logan v. State, supra,* neither Judge Whitfill nor Judge Close afforded appellant or his counsel the opportunity to speak in mitigation. *Nor did they ask his counsel, in appellant's presence, if appellant wished to be heard in mitigation.* The failure to afford appellant his right of allocution was error. Resentencing is required.

64 Md.App. at 357, 495 A.2d 366 (emphasis supplied).

The Court of Appeals reversed this Court in *State v. Fuller,* 308 Md. 547, 555, 520 A.2d 1315 (1987), and held unequivocally that there is no such an affirmative obligation on the trial judge.

In *State v. Lyles,* 308 Md. 129, 517 A.2d 761 (1986), we held, in part, that *Rule 4–342(d) by its unambiguous terms did not require a trial judge to inform a defendant that he had a right to allocute.* We further held that in any event, *a defendant's failure to object to the omission of an opportunity for allocution or proffer the contents of any desired allocution precludes appellate review of the issue.* Consequently, here, as in *Lyles,* the issue was not properly before the intermediate appellate court and is not now properly before this Court.

(Emphasis supplied).

All of our analysis herein with respect to the general right of allocution provided by Rule 4–342(e) applies with

equal validity to the indistinguishable right of allocution in a capital case provided by Rule 4–343(f). In either situation, under either rule, the right of allocution is not self-executing. A defendant wishing to avail himself of the right must assert it.

In the context of a sentencing hearing in a capital case, Chief Judge Murphy in *Harris v. State*, 306 Md. at 359, 509 A.2d 120, made it very clear that a defendant, to be entitled to allocution, must request it.

> These considerations are reflected in our current Rule 4–343, subsection (d) of which requires the court in a capital sentencing proceeding to afford the defendant an opportunity to allocute *if the defendant so requests.*

(Emphasis supplied).

Even under the slightly more indulgent common law right of allocution, a defendant, to be entitled to the right, was still required affirmatively to assert it.

> We conclude that, under the common law applicable to capital sentencing proceedings at the time Harris was sentenced, a defendant *who timely asserts his right to allocute, and provides an acceptable proffer,* must be afforded a fair opportunity to exercise this right.

*Id.* (emphasis supplied).

The appellant in this case neither requested allocution nor objected to the lack of it. Under the circumstances, he was not denied his right of allocution.[8]

---

**8.** If the language of this opinion, as it criticizes certain contentions as not being worthy of more than cursory appellate consideration, at times seems harsh, it is intended to be. It is, however, by no means intended to be a criticism of the very able assistant public defender who argued this appeal or of public defenders generally. She and they are diligent and dedicated lawyers who are called upon to perform a difficult and frustrating job, frequently with meager material with which to work.

Indeed, *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), has made it virtually impossible for a public defender to dismiss an entire appeal as "frivolous." Any arguably plausible argument that can be made must be made. Many such arguments, however, may at least border on the "frivolous" and our characterization of a

contention as frivolous should not be taken as a personal criticism of the attorney who raised the contention.

We recognize that even when a contention itself is strained, those who raise the contention are simply doing their job. By the same token, this Court is simply doing its job when it expresses, as forcefully as it knows how, its impatience with contentions that lack plausible merit and frankly do not warrant serious appellate consideration. A defendant is not entitled at the appellate level to have adjudicated in depth, as opposed to disposed of summarily, every complaint he may wish to make.

Even though strained arguments may not be totally ignored by an appellate advocate, thoughtful prioritizing among multiple arguments remains a sound appellate tactic. The attorney who treats every argument with equal gravity runs the danger of being perceived as was the legendary "boy who cried 'wolf.'" Some advocates sometimes append to a strained contention a phrase such as "raised at the express request of the defendant" in an effort to preserve long-term credibility with an appellate court. More subtle signals may be to characterize other contentions as "more significant," leaving unsaid the obvious implication. In either event, it is strategically wise to concentrate one's effort and to focus appellate attention on one's stronger points, even at an obvious cost to one's weaker points.

As the Supreme Court noted in *Smith v. Murray*, 477 U.S. 527, 536, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986):

> This process of "winnowing out weaker arguments on appeal and focusing on" those most likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy.

In *Gray v. Greer*, 800 F.2d 644, 647 (7th Cir. 1986), the United States Court of Appeals also commented on the virtue of selectivity.

> [T]he right to effective assistance of appellate counsel does not require an attorney to advance every conceivable argument on appeal which the trial record supports.

In *Jones v. Barnes*, 463 U.S. 745, 751–52, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983), the Supreme Court also noted:

> Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues.

Supreme Court Justice Robert Jackson's article "Advocacy Before the United States Supreme Court," 25 Temple L.Q. 115, 119 (1951), gave similar advice.

> "One of the first tests of a discriminating advocate is to select the question, or questions, that he will present orally. Legal contentions, like the currency, depreciate through over-issue. The mind of an appellate judge is habitually receptive to the suggestion that a lower court committed an error. But receptiveness declines as the number of assigned errors increases. Multiplicity hints at a lack of confidence in any one .... [E]xperience on the bench convinces me that multiplying assignments of error will dilute and weaken a good case and will not save a bad one."

The handbook by R. Stern, *Appellate Practice in the United States* 266 (1981), has similarly observed:

**JUDGMENTS AFFIRMED; COSTS TO BE PAID BY THE APPELLANT.**

Most cases present only one, two, or three significant questions . . . . The effect of adding weak arguments will be to dilute the force of the stronger ones.

See also *State v. Gross*, 134 Md.App. 528, 556–64, 760 A.2d 725 (2000).

This winnowing process is especially important with respect to criminal cases, where an overwhelming percentage of appeals are taken at governmental expense and where the costs normally associated with an appeal do not, therefore, serve as a healthy brake on what threatens to become an overly indulgent and runaway appellate process.

We stress again, however, that it is the system itself that is at times exasperating, not the attorneys who have no choice but to work with it. As they do their job, it may sometimes try our patience. As we do our job, it may sometimes try their patience. In neither case should it be taken personally.